2018 IL App (2d) 180575-U
No. 2-18-0575
Order filed December 9, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-511 |
| JAMES R. WILLIAMS, | ) ) | Honorable David Paul Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices McLaren and Brennan concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court: (1) did not conduct a proper preliminary *Krankel* inquiry, but any error in conducting the inquiry was harmless, and, thus, it did not err in determining that defendant's claims regarding an unedited surveillance video did not show possible neglect by trial counsel; and (2) did not err in denying defendant's *pro se* motion to reconsider sentence, where its error in refusing to view the unedited video was harmless.  Affirmed.

¶ 2   After a jury trial, defendant, James R. Williams, was convicted of aggravated battery (720 ILCS 5/12-3.05(a)(1) (West 2018)) and sentenced to 10 years' imprisonment.  Defendant appeals, arguing that the trial court did not give proper consideration to his claims concerning uncut portions of a surveillance video, where: (1) it failed to conduct an adequate preliminary (*i.e.*, first-

stage) examination, consistent with the procedure in *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), into his post-trial *pro se* ineffective-assistance-of-trial-counsel claim; and (2) in ruling on his *pro se* motion to reconsider sentence, where it refused to consider the unedited video on the grounds it was a matter *dehors* the record. We affirm.

¶ 3                                        I. BACKGROUND

¶ 4      The actions in this case arose out of defendant striking the victim, Melissa Mercer, on March 13, 2018. A grand jury indicted defendant with one count of aggravated domestic battery (720 ILCS 5/12-3.3(a) (West 2018)), three counts of aggravated battery (720 ILCS 5/12-3.05(a)(1), (c) (West 2018)), and two counts of domestic battery (720 ILCS 5/12-3.2(a)(1), (a)(2) (West 2018)). During discovery, the State disclosed several CDs to the defense. (Five video clips were subsequently admitted into evidence and played for the jury at trial. The unedited surveillance video that is the focus of defendant's appeal was not admitted into evidence and is not contained in the record on appeal.) During an April 19, 2018, pretrial hearing, both the State and defendant answered ready for trial the following Monday.

¶ 5                                        A. Trial

¶ 6      Britt Hawkins and Judy Kullenberg represented defendant at trial, which commenced on April 23, 2018.

¶ 7      Mercer testified that she had known defendant for 10 years, they had lived together 5 years ago, and she had dated him 4 years ago. On March 12, 2018, Mercer rented a first-floor room at the Super 8 Motel in Elgin so that she and defendant could drink and "hang out."

¶ 8      On the evening of March 12, 2018, there was no physical altercation between Mercer and defendant. That night, both Mercer and defendant drank, fell asleep, woke up, and drank some more. The drinking continued to the morning of March 13, 2018. At some point, defendant left

the room. When he returned, he was text messaging and talking on his phone. He appeared angry. That morning, defendant punched Mercer in the face and mouth while she stood between the two beds in the room. Mercer's mouth split open and bled. Mercer did not know why defendant punched her and asked him to leave. At some point, Mercer woke up on the floor, between the beds. She could not recall how she ended up on the floor. While she was on the floor, defendant said that he should kick Mercer in her face, and she asked him why he would do that. Mercer testified that she thinks that defendant kicked her, but she could not recall some of the events and believes that she passed out.

¶ 9     When Mercer woke on the floor, defendant was standing near the window. Mercer ran out of the room, because she did not want to be alone with defendant any longer. Mercer went to the lobby, turned, and saw defendant chasing her. By the front door, defendant punched Mercer. (A surveillance video shows defendant punching Mercer's head into a glass door in the hotel vestibule.) She kept telling him to leave. Defendant's ride was outside. Mercer had overheard him on the phone, arranging a ride.

¶ 10     At some point, defendant came back into the hotel, and Mercer was still in the lobby, in the hallway by the front desk. Defendant walked up to Mercer and hit her again in the lobby hallway area. (A surveillance video captured this act.) Eventually, defendant left, and Mercer returned to her room. After a while, Mercer went back to the front desk and asked an employee to call an ambulance. The police ultimately responded, and she spoke to them. Mercer was treated by paramedics and transported to Sherman Hospital.

¶ 11     Mercer sustained injuries to her mouth, and her face was bruised. She testified that she still had scar tissue in her lip, and her eye was still "messed up." Mercer identified several photographs depicting her injuries from that evening and of her hotel room. Several photographs

depict blood on the bed sheets. Mercer stated that the blood was not present when she checked into the room.

¶ 12    Mercer further testified that, when defendant punched her, it made her feel scared. She also described defendant as wearing Jordan "boots" that day.

¶ 13    On cross-examination, Mercer testified that, prior to leaving the hotel room after the police arrived, she asked to take alcohol with her. Police officers asked Mercer if she wanted to go to the hospital, and she stated that she did not want to go. Mercer further testified that, while telling defendant to leave while they were in the lobby, he walked outside at one point, and Mercer followed him out.

¶ 14    On re-direct examination, Mercer stated that she ultimately did go to the hospital. She wanted to call her mother to meet her there. The officer told her that she should go to the hospital based on what she had told him (*i.e.*, that defendant kicked her in the face and was stomping on her face).

¶ 15    Vidhi Patel was the front-desk receptionist of the Super 8 Motel on March 13, 2018. The hotel is open to the public and does not require membership. A stairwell is off to one side of the lobby, and the front door is off to the other side of the lobby.

¶ 16    At 9 a.m. that day, a black man and a Caucasian woman caught Patel's attention in the lobby. The female was loud and pointing, and she and the male walked outside the hotel. From the front desk, Patel could not see what occurred outside or in the doorway area. At some point, the two people returned. They came to the front desk and were loud. Patel said hello, and the man responded that they were okay. The female wore a pink hoody with the hood raised. Patel returned to her paperwork and, when she looked at the camera, she saw the woman stepping back a bit. She did not see what caused her to step back. The woman returned to the front desk after 30 minutes

and asked Patel to call 911. Patel called her supervisor, Nina Strickland (who called the police and testified that the hotel video-surveillance system was working at the relevant time). While the two people were in the lobby, the woman never asked Patel for help and she did not call the police.

¶ 17 Elgin police officer Thomas Coffield retrieved video from the hotel's security system, put the information on a thumb drive, and then burned the files onto a CD. He selected video for inclusion on the drive from just prior to the time that the call for service was received.

¶ 18 The CD exhibit, which consists of five video clips, was admitted into evidence. The video clips were played for the jury. The first video clip, timestamped between 8:32:28 and 8:33:21 a.m., shows the front-entrance vestibule of the hotel and depicts defendant swinging his arm and punching Mercer's head into a glass door. She then points toward the outer front door, leads him out the front door, and defendant walks away. Mercer then walks outside, paces near the front door, walks out of camera view, and then returns. The second clip shows the same incident, but with a view from the lobby area. The third clip, timestamped between 8:33:56 and 8:35:14, shows the lobby area and depicts Mercer entering the lobby area from the vestibule, followed by defendant, who motions to someone who is presumably at the front desk, and then depicts Mercer pushing/directing defendant away (defendant does not jolt or jerk back), the couple conversing, then Mercer directing defendant away, and having another conversation. Afterwards, defendant, who appears to grow agitated, makes a call on his phone while Mercer continues to speak to him, and then punches Mercer with his right hand. She walks down the hallway and out of camera view. Defendant lingers between the lobby and hallway areas and then follows Mercer down the hallway. The fourth clip, timestamped between 8:34:02 and 8:34:46 a.m., shows the same events from the hotel's first floor hallway. Mercer walks into and out of that area while presumably speaking to defendant, who is out of the camera's range. Several times, Mercer, with outstretched

hands, appears to stop defendant's movement toward her or to direct him away from her. The fifth clip, timestamped between 8:34:42 and 8:35:14 a.m., also shows the first-floor hallway, and depicts defendant hitting Mercer toward the back side of her head, Mercer walking away, defendant watching her walk down the hallway, and then defendant following after her.

¶ 19    Elgin firefighter/paramedic Robert Newby responded to the call from the motel. He observed cuts to Mercer's face, swelling around her left eye, and a slight shoe print and bruising on her forehead. Her vitals were normal, and she was alert and talkative, but her demeanor was agitated, wound up, and anxious. Mercer told Newby that she had been drinking most of the morning. Newby smelled an odor of alcohol on her breath. Newby gave Mercer something to control the bleeding and a cold pack for her swollen eye. Mercer denied any head, neck, or back pain, and she was alert and oriented.

¶ 20    Elgin police officer James Picardi responded to the call at the hotel at about 9 a.m., before the paramedics arrived. His body camera was on. Mercer was outside the hotel, smoking. She was talkative, excited, and crying, and Picardi observed injuries to her eyes, lips, and nose and blood on her shirt. Picardi took photographs of Mercer. Mercer mentioned that she had known defendant for 10 years.

¶ 21    Picardi entered Mercer's hotel room, which was orderly, except for a red substance on the bed closest to the door, as well as a dry liquid on the floor between the two beds. Mercer never stated that she had a relationship with defendant or that they had lived together. Initially, Mercer did not want to go to the hospital.

¶ 22    Picardi spoke to hotel staff and then went to the hospital to speak with Mercer. At the hospital, Picardi's body camera was turned off. Picardi also went to the jail and saw defendant. He saw defendant's shoes. When shown photographs that depicted blue Nike leather basketball

shoes, Picardi identified them as the shoes that defendant had worn to the jail. The shoes also had a dried red substance on them that looked like blood spatter.

¶ 23    Elgin police officer Jason Lentz assisted officer Picardi in locating defendant. Based on information he had received that a woman's vehicle was involved in the incident, Lentz determined that defendant might have been at the woman's apartment. At the apartment building, Lentz rang the doorbells of tenants until someone answered. Upon entering the foyer, Lentz saw Angelica Silva and asked her if defendant was home. Based on her answer, he proceeded upstairs to the apartment, and, once inside, defendant was standing near the couch. The officers took defendant into custody.

¶ 24    Defendant was photographed at booking. Lentz noticed a scratch with scraping and what appeared to be blood on defendant's right knuckle and apparent blood on his clothing. Lentz collected defendant's sweatshirt, which had spatter on the shoulder and chest areas and apparent blood on the sleeve. The red substance was never tested.

¶ 25    Dr. Jason Foreman treated Mercer at the emergency room. Dr. Foreman testified that, when she arrived, Mercer was upset, crying, and looked uncomfortable, but she was not actively bleeding (although there was blood in her nose). She had bruising to her left eye and a cut on her upper lip; she also complained of pain to her eye, lip, and head. Mercer reported that she was kicked in the face multiple times, and her injuries were consistent with being kicked in the face. Dr. Foreman diagnosed her with a left periorbital contusion (*i.e.*, bruising and swelling, usually with some kind of blunt force), facial contusion, specifically at the nose, and upper lip laceration. He administered two stitches to her upper lip and provided instructions for outpatient care. Mercer told Dr. Freeman that she did not think she had loss of consciousness. A CT scan revealed no injuries to Mercer's head, teeth, cervical spine, or facial bones.

¶ 26 Angelica Silva, defendant's ex-girlfriend, testified that, on March 13, 2018, defendant called her and asked her to pick him up from the Super 8 Motel. When she arrived at 8 a.m., Silva did not see defendant, and she left. Defendant called her again, asking her to return. She stated that she would pick him up after she dropped off her children at school. Silva returned to the hotel at 8:15 or 8:30 a.m. Defendant came to the car, and she drove him to her home. Defendant appeared to be intoxicated.

¶ 27 The State rested, and defendant's motion for a directed verdict was denied.

¶ 28 Defendant, age 39, testified that, in 2008 he was convicted of attempt aggravated discharge of a firearm. In 2013, he was convicted of escape.

¶ 29 In late 2015, defendant moved in with his current girlfriend, "Naomi." He had known Mercer since the mid-1990s. He dated Mercer's sister (Danielle), and his best friend (Brian O'Dell) was Mercer's boyfriend. Defendant denied ever dating, having sex with, or having lived with Mercer.

¶ 30 Around 9 p.m. on March 12, 2018, defendant drove Mercer to the Super 8 Motel. Because Mercer knew that one of defendant's best friends had died that morning, she had called defendant to express her condolences and offered for defendant to drink with her in a hotel room she rented. Defendant picked up Mercer, and they stopped at a store so Mercer could purchase three bottles of tequila. Defendant also testified that Mercer brought one-half ounce of cocaine and Ecstasy and Xanax pills.

¶ 31 In the hotel room, defendant ingested cocaine and tequila, and Mercer ingested cocaine and the pills. Both drank before they fell asleep around 2 or 3 a.m. Defendant awoke at about 5 a.m. and looked at his phone and drank. Ten minutes later, Mercer awoke and drank. Defendant did

not want to drive, so, at 6 a.m., he called Silva for a ride. Silva told defendant that she would pick him up around 8:15 a.m., after she dropped off her daughter at school.

¶ 32    Mercer ingested cocaine and went to use the bathroom. When she returned, she accused defendant of taking some of her drugs. As defendant got ready to leave, Mercer started "acting crazy." Defendant testified that he tried to calm her down and told her to stop being loud and attracting potential attention. Mercer panicked and tried to search defendant for her drugs. Defendant testified that he did not take Mercer's drugs.

¶ 33    Defendant became frustrated hearing Mercer nag and complain about something he allegedly did to her. Defendant sat on the bed nearest the door and got up to leave, and Mercer sat in a chair by the other bed. He was getting ready to leave so he would not have to "hear[ ] her mouth," but "she attempted to like come back towards me and fell down; and I checked on her. She was okay. *** I think she hit her face maybe like the side of her face or something." When defendant started to leave, Mercer stood up "in a hurry to try to stop me." She fell into the table that held the microwave and refrigerator. (Defendant also testified that she tripped over the table and "fell and hit herself like between the frigerator [(*sic*)] and the table where the TV at [(*sic*)].") "But she jumped back up. So I didn't think nothing [(*sic*)] was wrong." Defendant does not know where Mercer hit herself, and he did not notice any injuries to her face. Mercer was loud, and defendant tried to calm her down. Defendant was upset with Mercer. They started talking again. At one point, Mercer left the room, stating she was going to call Naomi and she sent (from her phone) pictures (of defendant at the hotel doing drugs) to Naomi, Angelica, defendant's sister, and defendant's son. This upset defendant. When she returned, defendant left. Mercer had nothing in her hands at this time.

¶ 34    Defendant drove to the Thornton's gas station next to the hotel, but returned to the hotel, because he saw a police car at the station.  He realized that Mercer had his other phone (he uses one phone for the internet and one as a "regular" phone) and returned to her room.  Mercer let defendant in.  Defendant placed his keys on the microwave or refrigerator.  Mercer would not give him his phone, because she believed he had her drugs.  According to defendant, when he tried to take his phone from Mercer, she took his keys, stabbed him, and scraped his wrists.  (Defendant claimed that there was blood and that he showed his wrists the police.)  He tried to calm her down, but she would not calm down, "[a]nd so I hit her, and she fell down, and she was holding onto my leg."  This occurred between the table and bed, by the refrigerator.   Defendant testified that he punched Mercer once toward the back of her head.

¶ 35    "And so, finally, I get my leg free from her, and I got up—well, she got up, grabbed the bottle that was sitting—like there's a table between the two beds, and she grabbed the bottle, and I rushed her to the bed, and I got the bottle from her while she was still going crazy, and then I just, I started punching her."  According to defendant, Mercer tried to swing the bottle before he took it from her.  He punched and slapped her three or four times with his right hand.  Defendant testified that he was trying to defend himself.  Defendant tried to calm down Mercer, but she kept scratching at him and biting at him.  (On cross-examination, defendant testified that Mercer tried to bite him.)  When asked where Mercer scratched him, defendant replied, "Just like my arms, chest area; back maybe.  I mean, I don't remember exactly where.  She was just scratching at me and trying to bite at me."  When he could not get Mercer to stop biting at and scratching him, "that's when I started hitting her."  The scratches led him to punch Mercer three or four times in the face.  Defendant testified that he showed his injuries to the police and did not tell them "exactly" how they happened, but "I just said she attacked me."

¶ 36    Mercer eventually left the room and, a minute or two later, defendant left.  Defendant testified that he walked toward the front door.  Once at the front hotel doorway, he saw Mercer standing there.  When asked "what happened there?", defendant replied: "I punched her."  Prior to punching her, Mercer had made no contact with defendant outside the hotel room.

¶ 37    He left the hotel and then returned.  He waited for his ride.  According to defendant, when others were not around, Mercer was trying to get him to stay to find drugs for her.  "[W]hen I was leaving, she was pulling me telling me, trying to get me to come back in.  And I was telling her leave me alone; let me just go.  And I did like this, like threw a punch towards her.  I didn't hit her, but I threw a punch towards her for her to let me go and leave me alone.  We was [(*sic*)] outside and then my ride came."

¶ 38    Defendant further testified that, at Angelica's house, an officer asked him if he got into a fight earlier that day.  Defendant replied that nothing had happened.  Also, defendant denied that, while in jail, he told an officer that he did not know Mercer.  Defendant further testified that he started living with Silva in 2015, but moved out at the end of that year and moved in with his current girlfriend, who is not Mercer.

¶ 39    In rebuttal, the State called Theresa DeLaRosa, Mercer's mother.  DeLaRosa testified that she met defendant when he dated Mercer.  Though she was aware that defendant was incarcerated several times during the past 10 years, DeLaRosa believed that he and Mercer were in love.  They lived together four or five years ago.  DeLaRosa denied that defendant dated any of her other daughters.

¶ 40    Mercer testified in rebuttal that, while in the hotel room with defendant, she never fell and hit her head on a table or refrigerator.  She also denied grabbing defendant's keys and stabbing him with them.  Mercer also testified that she never grabbed a bottle and attempted to hit defendant

with it, and she denied ever scratching him or grabbing his leg and begging him not to leave. She explained that defendant was bigger than her and that she cannot fight him.

¶ 41    In the hospital, the officer photographed her hands. Other than a bandage over the finger from which hospital staff took blood, there were no other injuries to her hands.

¶ 42    Officer Lentz testified in rebuttal that he photographed defendant during booking. He saw only one injury: to defendant's knuckle. During the booking process, defendant never stated that Mercer attacked, stabbed, scratched, or bit him, nor did he say that he was trying to defend himself. Defendant told Lentz that he did not know Mercer. (Photos showed no injuries to his head, torso, arms, chest, or back.)

¶ 43    During closing arguments, defense counsel requested a recess, informing the court that defendant wanted to give his own closing argument. The court granted a recess. Upon re-convening, counsel repeated that defendant wished to give his own closing argument. Noting that he had been represented by counsel during trial, the court denied defendant's request. Defendant stated that his reason for his request was, "because I see the [S]tate withheld a lot of evidence, videos." He also asserted, "There's videos of the evidence I'm talking about." The trial court noted that the jury could view the videos that were admitted into evidence. Defendant argued that the State showed an "edited version" of the video and that he viewed the unedited video at the jail. The court noted that the jury could not view videos that were not admitted into evidence. Defendant replied, "but when the [S]tate sit there and lie and say there's no video of her [(*i.e.*, Mercer)] pulling me back in when I'm trying to leave--." The court denied defendant's request and recessed. Upon reconvening, defense counsel noted that defendant wished to address the court. He asked again to give his own closing, because the State, according to defendant, lied and:

"then I got the video to support it. There was testimony about it. She [(*i.e.*, the assistant State's Attorney)] said that she asked me when I was leaving what happened. I said [Mercer] was pulling me to come back in, and I threw a punch at her before I actually got in the car. She said to the jury there was no video of that which is a blatant lie. They ended it after the thing she showed there, and I want to be able to show the jury that this lady told a flat out lie to try to get a conviction, and I seen [(*sic*)] the video myself with my attorneys."

¶ 44    The trial court noted that the evidence was closed and that the video that was admitted during trial was the only video that the jury would be allowed to view. "For them to say I'm lying, why they just didn't show the video? I'm wondering why—I brought it up to my attorneys several times." The court denied defendant's request to give his own closing argument. Defendant then stated that he wanted to "fire" his attorneys for ineffectiveness, because the State withheld evidence. The court denied this request and began to tell defendant to file something, when defendant cut off the court, "You say I can't file this; can't file that. You know they lying." The court instructed defendant to file the appropriate motions after trial. Defense counsel provided closing argument. During the State's rebuttal argument, defendant stated, "Show the video," and the court admonished him not to speak.

¶ 45                    B. Verdict and Subsequent Proceedings

¶ 46    The jury found defendant not guilty of aggravated domestic battery and two counts of domestic battery. However, it found him guilty of aggravated battery (great bodily harm) and two counts of aggravated battery (public place of accommodation).

¶ 47                    1. Posttrial Motion and Preliminary *Krankel* Inquiry

¶ 48    Defense counsel filed a posttrial motion and attached as an exhibit defendant's *pro se* posttrial motion alleging ineffective assistance of trial counsel.  In his *pro se* motion, defendant argued that trial counsel knew the State withheld evidence and committed perjury but did nothing about it.  He claimed the police lied to the grand jury and that counsel failed to move to dismiss.  Defendant also asserted that counsel failed to show him discovery and that he was not given a fair chance to prepare for trial.  Defendant also argued that trial counsel was ineffective, where the State elected to go to trial without giving defendant a fair chance to prepare, turned over discovery on the day of jury selection, and selected a trial date before discovery was complete and before defendant was arraigned on the indictment.  Defendant also asserted that counsel was ineffective for failing to call witnesses to impeach Mercer with a statement she gave prosecutors stating that she did not remember anything.  He maintained that, had Mercer been impeached, the verdict may have been different.  Defendant also argued that trial counsel failed to object to the State's perjury and misconduct regarding Lentz's rebuttal testimony (that defendant told him he did not know Mercer, that he did not mention he was trying to defend himself, and that defendant never mentioned that Mercer attacked or pushed him), which impeached him.  Finally, he asserted that counsel failed to move for a mistrial regarding the seating and excusing of a juror.

¶ 49    During the posttrial hearing, defendant presented the arguments he raised in his motion. He argued that he told his attorneys that he did not think that it was fair that the State elected to go to trial when he had not seen all of the evidence.  He also asserted that he pointed out to counsel that the police lied to the grand jury and that counsel did nothing about it.  Without identifying specific witnesses, defendant asserted that counsel had a witness to impeach Mercer, but did not call that witness.  He noted that Mercer was texting his sister and telling her that the State and police were harassing her and coercing her to do things; he asked counsel to call his sister about

this, but they did not call her. Defendant also asserted that he asked counsel to call Naomi to ask about it, but they did not call her. He asserted that he did not feel that his attorneys represented him diligently in his case.

¶ 50    When defendant brought up the video, the trial court cut him off, noting that he had to limit his argument to what was raised in his motion. Nevertheless, defendant argued that the State had impeached him on matters he brought to counsel's attention, such as the State's "blatant" lie (at trial and during closing argument) that the video did not exist. He asserted that he asked defense counsel to raise the issue, but they did not. Defendant also asserted that the State's impeachment of him by officer Lentz was deception, because he told "sergeant Hartman" what happened instead.

¶ 51    The trial court asked one of the attorneys representing defendant if she wished to respond to defendant's allegations, and counsel responded that she stood on her motion. The State did not substantively participate in the inquiry regarding defendant's ineffective-assistance claims.

¶ 52    The court found that defendant had "very effective" assistance of counsel in his case. Addressing defendant's claim concerning discovery, the court found that he had demanded a speedy trial, and did not give his trial counsel "a choice as to whether or not they were going to wait for more discovery[.]" The court explained that counsel has no control over which case the State elects to prosecute. The court also noted that trial counsel had everything that was required for trial and did "a very fine job" during trial. Turning next to defendant's claim concerning an alleged lie the police told the grand jury, the court found that was no evidence of such in the record. As to the unnamed impeachment witness, the court found that it was a matter of trial strategy whether to call the witness. As to the dismissed juror, the court found the juror (who was a therapist who might have had contact with someone with whom defendant was involved) was dismissed in a timely fashion.

¶ 53    Addressing the video, the trial court found that defendant's assertion that there were other portions of the video that would have exonerated him was "completely unsubstantiated." It determined that defendant did not raise anything "that gives rise to any issue of merit." Accordingly, the court denied defendant's *pro se* motion (and defense counsel's motion) and did not appoint *Krankel* counsel.

¶ 54                                    2. Sentencing

¶ 55    At sentencing, the court noted that defendant was found guilty of three counts of aggravated battery and that the counts merged into one sentence. Defendant corrected the pre-sentence investigation (PSI) report. The PSI included defendant's *pro se* letter to the court in which he claimed he asked trial counsel to show the video to support his testimony, but that counsel ignored him and silenced him. He repeated his allegations concerning trial preparedness, grand-jury testimony, and the State's commission of "many injustices." Defendant also listed things for which he claimed he was unjustly charged.

¶ 56    Mercer testified that she started dating defendant in 2011 and ended the relationship in 2015. She broke up with defendant after a physical altercation (he punched her twice) and his harassment of her in 2017. Addressing the 2018 incident at issue in this case, Mercer testified that she still has bruising under her eye, gets headaches, has issues with her eye, her lip is numb, and she had stitches in her mouth. Mercer kept going back to defendant, because she loved him and thought every time that it would be different. "He would be fine for a few days, and then a whole different person."

¶ 57    Elgin police detective Christopher Hughes testified about investigating defendant's involvement in the 2004 shooting of Terry Johnson. Elgin police detective Ryan Davenport testified about investigating the 2011 aggravated battery of Larisa Dungey with a brick. Elgin

police officer Shaun Schroeder testified about investigating the 2015 domestic battery of Silva. Elgin police officer Michael Fuller testified about investigating a domestic battery of Silva in February 2016. Elgin police officer Mark Sopek testified about investigating unwanted phone calls from defendant to Silva in June 2016. Theresa DeLaRosa testified about defendant threatening to kill Mercer in October 2016.

¶ 58 In mitigation, defendant submitted three letters from his family members and updated information about his anger-management course. He also spoke in allocution, apologizing to Mercer, stating, "I know I did her wrong." Defendant also asserted that the State and police overcharged him and coerced Mercer to fabricate the charges and that the police lied to the grand jury. He claimed that defense counsel did not investigate text messages that he told them about (concerning the State and police coercing Mercer) and denied that he had a romantic relationship with Mercer. He repeated that he knew he "did [Mercer] wrong," but that DeLaRosa's testimony that she was scared of defendant was a lie. Turning to the video, defendant noted that the State impeached his testimony that Mercer was pulling him as he was trying to leave, and he threw a punch at Mercer. Defendant denied hitting Mercer and complained that the State "waited to see the jury to make me out to be a liar and denied that the video existed. My attorney has got the video right here." Defendant stated that he "did wrong, but they did wrong, but they going [(*sic*)] unpunished for their wrongdoing."

¶ 59 During its argument, the State denied that there was a video that showed Mercer begging defendant to stay:

"And then he wants The Court to be convinced that there is some magical video out there in which Ms. Mercer is begging the defendant to stay. There is no such video, no

such video. If there was, I am pretty confident that the defense would have played it in their case. Guess what? They didn't. You know why? Because it doesn't exist."

¶ 60    The trial court sentenced defendant to 10 years' imprisonment, to be served at 50%. (The court noted that the range was 2 to 10 years.) It found that imprisonment was necessary to protect the public. The court noted that defendant had 11 prior felony offenses and several pending felony cases, almost all of which were violent offenses. The court found that defendant is a danger to society, proving it "time and time again with the shooting incident, violent behavior, beats women." It further determined that probation or conditional discharge would deprecate the seriousness of his conduct. "[T]he truth is in the video where you punched her in the head." The court noted that defendant's conduct was brazen and that he smashed the side of Mercer's head with a fist "for no reason." The court also commented that it would have been better had defendant not made the statement in allocution, where he stated he knew he did wrong, but blamed everyone else for his conduct. Reviewing his criminal history, the court noted that defendant was eligible for an extended sentence based on his previous conviction.

¶ 61    At the conclusion of the sentencing hearing, defense counsel informed the court that defendant wished to proceed *pro se*. The court discharged the Public Defender. Defendant stated that he had proof of everything he told the court. The court informed him that he must file a written motion, and defendant responded, "I have got the video right here."

¶ 62                          3. *Pro Se* Motion to Reconsider Sentence

¶ 63    On June 20, 2018, defendant, *pro se*, moved to reconsider sentence, arguing that his sentence was excessive, the trial court failed to give weight to his rehabilitative potential, Mercer was not seriously injured, and the court failed to consider in mitigation: his educational efforts; his conduct did not cause serious physical harm; he did not contemplate it would do so; he acted under

the strong provocation of alcohol, the victim's attacks and threats, and the loss of his friend the previous day; his conduct was the result of circumstances unlikely to recur; his character and attitude show he is unlikely to commit another crime due to his new outlook on life; he is likely to comply with probation; and imprisonment would entail excessive hardship on his son. Defendant also asserted that the State committed perjury by denying the existence of a video showing him trying to leave and Mercer trying to stop him. Defendant argued that defense counsel had the video, they conferred that they could show it, but counsel refused to do so. Defendant asserted that he had no disciplinary history while incarcerated and that he took an anger-management course. He argued the trial court abused its discretion in its failure to acknowledge the State's perjury against him, its improper double enhancement of the sentences, and its unfair decisions against him. He also complained that the court failed to consider his letter.

¶ 64    At the hearing on defendant's motion, defendant noted that the State had a copy of the CD and that he wanted to play the entire disk. The trial court declined his request, noting that it would not consider evidence not presented at trial. (The State also objected, noting the only a portion of the video was played at trial, not the entire video.) The State informed the court that it had reviewed the entire video ("to see if maybe I missed something[,] and the things that the defendant alleges in his motion are not there") and that the "only thing that I missed is that there was another incident outside of the Super 8 Motel that could have been presented and wasn't" and maintained that, if there was something showing what defendant believed the video showed, defense counsel would have shown it. Later, the State asserted that, "[t]here was nothing on that video that shows that Ms. Mercer was holding the defendant back or begging him to stay."

¶ 65    Defendant asserted that, if the court viewed the video ("[i]t's probably like a minute"), it would realize that the events that the State denied existing actually occurred and that "my attorney

at the time [and at the sentencing hearing] said that they could have showed [(*sic*)] it but for some reason they didn't."

¶ 66    When defendant argued that Mercer's injury did not constitute great bodily harm, the trial court commented that it saw defendant "hit somebody for no reason on the video."  Defendant responded that he did it, but it was not for no reason; "[n]ot a good reason but it was out of anger."

¶ 67    The trial court denied defendant's motion, but granted his request for counsel.  Defendant appeals.

¶ 68                                    II. ANALYSIS

¶ 69    Defendant argues that the trial court failed to give due consideration to his claims concerning the unedited surveillance video and that this constituted reversible error.  Specifically he maintains that the trial court: (1) did not conduct a proper preliminary *Krankel* inquiry regarding his *pro se* posttrial motion; and (2) refused to consider the unedited video recording in denying his motion to reconsider sentence.  (Again, the uncut version of the surveillance video is not part of the record on appeal.)  For the following reasons, we reject defendant's arguments.

¶ 70                         A. Preliminary *Krankel* Inquiry

¶ 71    Defendant asserts that the preliminary *Krankel* inquiry was inadequate, because the trial court did not explore the facts underlying his ineffective-assistance claim as to the video.

¶ 72    We review *de novo* whether the trial court properly conduced a *Krankel* inquiry.  *People v. Roddis*, 2020 IL 124352, ¶ 33.  If the trial court did so and reached a determination on the merits of the defendant's ineffective-assistance claims, we will reverse only if the determination was manifestly erroneous.  See *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008) (trial court's ruling in preliminary *Krankel* inquiry that is based on its assessment that ineffective-assistance

claim was "spurious" will be reversed where it is manifestly erroneous). Manifest error is error that is "clearly evident, plain, and indisputable." *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997).

¶ 73 A common-law procedure has developed following our supreme court's *Krankel* decision, and it "is triggered when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29. Under the common-law procedure, the trial court must first (in what is called the preliminary inquiry), at a minimum (*People v. Roddis*, 2020 IL 124352, ¶ 54) examine the factual basis of the defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). Further, "a trial court [is] able to consider the merits *in their entirety* when determining whether to appoint new counsel[.]" (Emphasis in original.) *Roddis*, 2020 IL 124352, ¶ 61. If the court determines that the claim lacks merit or pertains only to matters of trial strategy, it need not appoint new counsel and may deny the defendant's *pro se* motion. *Moore*, 207 Ill. 2d at 78. "A claim lacks merit if it is conclusory, misleading, or legally immaterial or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel." *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 40.

¶ 74 However, if the allegations show "possible neglect" of the case, then new counsel should be appointed. *Id.* Following the appointment of counsel (*Krankel* counsel), the case proceeds to the second *Krankel* stage, which consists of an adversarial and evidentiary hearing on the defendant's claims and during which *Krankel* counsel represents the defendant. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶¶ 43, 47 (*Krankel* counsel acts as "an advocate for the defendant, not for the State or the trial court") (emphasis omitted). At the second-stage adversarial hearing, *Krankel* counsel must independently review the defendant's *pro se* ineffective-assistance allegations and then must present any nonfrivolous claims (*i.e.*, those with an arguable basis in law or in fact) to the trial court. *Id.* ¶¶ 49-50, 54.

¶ 75    This case, again, involves a preliminary *Krankel* inquiry. The preliminary inquiry's purpose is to allow the trial court to ascertain the factual basis for the defendant's claims and to afford the defendant the opportunity to explain and support his or her claims. *People v. Ayres*, 2017 IL 120071, ¶ 24. In this way, the court can determine whether to appoint independent counsel to argue the defendant's claims. *People v. Patrick*, 2011 IL 111666, ¶ 39. "By initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal." *Jolly*, 2014 IL 117142, ¶ 38; see also *People v. Jackson*, 2020 IL 124112, ¶ 95. "[T]he inquiry is not burdensome upon the circuit court, and the facts and circumstances surrounding the claim will be much clearer in the minds of all involved when the inquiry is made just subsequent to trial or plea, as opposed to years later on appeal." *Ayres*, 2017 IL 120071, ¶ 21. The trial court can "base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 79. The "preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding" and, because the defendant is not appointed counsel at this stage, the State's participation, if any, must be *de minimus*. *Jolly*, 2014 IL 117142, ¶ 38.

¶ 76    As the defendant need only raise a colorable claim of ineffective assistance at a preliminary *Krankel* inquiry, the correct inquiry, in determining whether there was "possible neglect," is to ask whether defense counsel's performance was arguably ineffective. See *McLaurin*, 2012 IL App (1st) 102943, ¶ 40 (claim lacks merit if it "does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel").

¶ 77    Generally, claims of ineffective assistance of counsel are considered under the familiar standard established in *Strickland v. Washington*, 466 U.S. 668, 687-94 (1984). *People v. Cherry*,

2016 IL 118728, ¶ 24. To prevail on a claim of ineffective assistance under *Strickland*, a defendant must show both that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant. *Id.* "In other words, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *Downs*, 2017 IL App (2d) 121156-C, ¶ 39. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The defendant must satisfy both prongs of *Strickland*; if the defendant fails to satisfy either prong, he or she cannot prevail on his or her claim. *Downs*, 2017 IL App (2d) 121156-C, ¶ 39.

¶ 78 Here, in his *pro se* motion for a new trial, defendant raised several allegations of ineffective assistance of trial counsel. During the preliminary *Krankel* inquiry, trial counsel stood on her motion and did not address defendant's assertions. At the conclusion of the *Krankel* inquiry, the trial court denied defendant's motion, finding that he had "very effective" assistance of counsel and that defendant had not raised "any issue of merit." Specifically addressing the video, the court determined that defendant's claim that the unedited video would have exonerated him was "completely unsubstantiated."

¶ 79 Defendant notes that the trial court did not have any interchange at all with defense counsel, who stood on her motion. Thus, defendant argues, the court did not determine whether or not defense counsel had reviewed the uncut recording. Defendant also complains that the court did not discuss with him the specifics about what he was alleging the uncut version of the video actually portrayed. He claims that the complete recording would have shown other events that exonerated him or, at least, that would have supported his version of the events.

¶ 80    Defendant further notes that defense counsel did not even provide assurance to the court that she had viewed the entirety of the video. He asserts that there was no justification for the court's failure to explore the contents of the complete recording with defendant or defense counsel or, alternatively, for the court itself to view the entire video in assessing defendant's ineffectiveness claim. Defendant argues that the trial court failed to make any factual inquiry at all as to whether the unedited video contains exculpatory evidence. Addressing the opportunity to present his claim to the court, defendant asserts that he repeatedly advanced his *pro se* claim to the effect that the unedited video would demonstrate the fundamental untruthfulness of the State's case against him. This is, he maintains, a facially-meritorious allegation that was rejected by the trial court without any basis, other than to note that defendant's exoneration claim was unsubstantiated. The substantiation, defendant urges, would have been accomplished by the trial court's simple viewing of the recording. Instead, he notes, the court rejected his claim on its merits without conducting any investigation or having any relevant knowledge regarding those merits. Defendant also claims that his assertion that the unedited video would have been exculpatory is not disproven by the record. He denies that his claims about the video relate only to events that occurred *after* the conduct for which he was convicted. In support, he points to the fact that, when he first raised the issue, he had a "much broader complaint about the video evidence" and that the event to which he testified would have been supported by the video. Thus, in his view, he claimed that the unshown video "was fundamentally crucial to his case."

¶ 81    The State responds that the trial court adequately inquired into defendant's claim concerning the video and that the court was not required to have an exchange with defense counsel. The trial court, according to the State, permitted defendant to speak to his allegations and gave him an adequate opportunity to provide factual detail concerning his allegations; it also gave

defense counsel the opportunity to respond, which counsel declined. The court, it asserts, maintained a neutral non-adversarial proceeding. The State further notes that the trial court was already familiar with the substance of defendant's complaint regarding the unedited video.

¶ 82    The State also contends that the trial court properly decided that defendant's allegations lacked merit and that this finding was not manifestly erroneous. It argues that defense counsels' decision concerning the video was one of trial strategy and, thus, could not serve as the basis of a *Krankel* claim. The video incident, the State notes, allegedly portrays an event that occurred *after* defendant had already completed the offenses for which he was charged and ultimately convicted. Thus, it would not have exonerated him of kicking Mercer in the room and the two incidents captured on the video. The State maintains that counsel had a sound trial strategy in not showing a potential fourth confrontation between the physically smaller and bloodied Mercer and defendant.

¶ 83    We conclude that, although the trial court did not conduct an adequate preliminary *Krankel* inquiry, under the circumstances of this case, there was no prejudice to defendant, and the court did not manifestly err in denying defendant's *pro se* motion alleging ineffective assistance of trial counsel. See *Moore*, 207 Ill. 2d at 80 (citing cases applying harmless-error analysis to assess trial court's denial, in preliminary *Krankel* inquiry, of a defendant's *pro se* posttrial ineffective-assistance claims); see also *Jackson*, 2020 IL 124112, ¶¶ 124-29 (applying harmless-error review of preliminary *Krankel* inquiry, where the trial court had erroneously permitted the State's adversarial participation; prosecutor's remarks did not distort the record and preclude appellate review of the defendant's claims).

¶ 84    The entire inquiry was not properly conducted and, thus, not entirely adequate. As defendant concedes, the method for conducting a preliminary inquiry is not precisely defined.

2018 IL App (2d) 180575-U

However, case law instructs that, during a preliminary *Krankel* inquiry, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Jolly*, 2014 IL 117142, ¶ 30; see also *Jackson*, 2020 IL 124112, ¶ 110; *Moore*, 207 Ill. 2d at 78 ("[t]rial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations."). "The trial court may inquire of trial counsel about the defendant's *pro se* allegations, and the court may briefly discuss the allegations with the defendant. Also, the trial court may base its determination on its knowledge of defense counsel's performance at trial and the facial insufficiency of the defendant's allegations." *Jackson*, 2020 IL 124112, ¶ 110; see also *Ayres*, 2017 IL 120071, ¶ 12. There is no *requirement* that defense counsel respond to the allegations. Indeed, the trial court may rely on its knowledge of defendant's allegations, the trial itself, and trial counsel's performance. *Id.;* see, *e.g.*, *People v. Banks*, 237 Ill. 2d 154, 214-15 (2010) (holding that court, at preliminary *Krankel* inquiry, adequately inquired into the defendant's claims; even though court asked defense counsel only whether he had examined any possible witnesses or other avenues, where issue had twice previously been presented and counsel had previously informed that court that he had discussed the witness issue at length with the defendant but counsel did not want to present the witness, court was already familiar with substance of the defendant's complaint and inquiry "did not need to be lengthy" and, thus, was sufficient).

¶ 85    Here, defendant first raised the incident he alleges is shown in the unedited video during cross-examination. He testified that, as he was leaving the hotel and after the events for which he was charged occurred, Mercer "was pulling me telling me, trying to get me to come back in. And I was telling her leave me alone; let me just go. And I did like this, like threw a punch towards

her.  I didn't hit her, but I threw a punch towards her for her to let me go and leave me alone.  We was [(*sic*)] outside and then my ride came."  Next, during closing arguments, defendant asserted that he wanted to give his own closing argument, because the State had lied in stating that there was no video of Mercer "pulling me back in when I'm trying to leave" and that the *unedited* video, which he had viewed *with his attorneys* while in jail, supported his claim.  He also asserted that he brought up several times to his attorneys the issue of showing the unedited video and that he wanted to "fire" trial counsel for ineffective assistance.  At the *Krankel* inquiry, defendant asserted that he had asked trial counsel to raise the video issue, but counsel did not.  Counsel, in response to the court's inquiry if she wished to address to defendant's allegations, stood on her motion.  The trial court denied defendant's motion, finding that he had "very effective" assistance of counsel and that his assertion that there existed video that would exonerate him was "completely unsubstantiated" and his motion raised no meritorious issues.

¶ 86    We conclude that, at the point that counsel answered that she stood on her motion, it was incumbent on the trial court, at a minimum, to ask counsel if she had viewed the unedited video or to view it itself.  Its failure to make this obvious inquiry of counsel (or to view the evidence itself) renders inadequate this aspect of the preliminary inquiry.  However, we disagree with defendant that the trial court did not fully explore the facts underlying his claim at the preliminary inquiry.  Even though the court did not even ascertain whether defense counsel viewed the video (or that the court itself did not view the video), the record shows that, during closing arguments, defendant stated that he *had* viewed the video *with his attorneys* while he was in jail.  Although it is unclear to us why defense counsel did not respond to defendant's claims at the preliminary *Krankel* inquiry, especially when it is generally expected that counsel would do so, and, again, why the trial court did not inquire of counsel or view the video itself, in this case, these omissions are

- 27 -

inconsequential. Notwithstanding trial counsel's silence on the video issue, defendant himself stated that he had viewed the video with counsel; further, defendant characterized the portion not shown to the jury as depicting him acting defensively and attempting to strike Mercer as he was leaving the hotel, which occurred *after* the batteries for which he was convicted. This was sufficient information from which the trial court could assess whether defendant had shown possible neglect by trial counsel. Defendant offers no more. He did not, as he asserts, make a *broader* complaint about the unedited video. His claim centered on Mercer's alleged pulling of him before he left the hotel. Defendant does not allege, for example, that other portions of the unedited video show that he acted defensively when he punched Mercer's head into the glass door in the hotel lobby (indeed, the video shown at trial refutes this assertion).

¶ 87    We further conclude that, even though the trial court conducted an inadequate inquiry, there was no prejudice to defendant and, thus, the trial court did not manifestly err in denying defendant's *pro se* motion. The events allegedly depicted in the unedited video would not have exonerated defendant, where, as noted, they occurred *after* the events for which he was charged and convicted. Generally, the questions whether to call certain witnesses, whether to present an alibi defense, and what matters to object to and when to object are matters of trial strategy reserved to trial counsel's discretion. *Jackson*, 2020 IL 124112, ¶ 106; see also *People v. West*, 187 Ill. 2d 418, 432, (1999) (decisions concerning which witnesses to call and what evidence to present are matters of trial strategy and are generally immune from claims of ineffective assistance of counsel). Thus, they "cannot serve as the basis of *Krankel* claim." *Jackson*, 2020 IL 124112, ¶ 106 (preliminary *Krankel* inquiry). Defense counsel could have reasonably determined that the video claim was not meritorious. This was a clearly a decision concerning trial strategy and cannot show

deficient performance or prejudice resulting from the failure to show the video during trial, as it would not have exonerated defendant. Defendant failed to show possible neglect by trial counsel.

¶ 88    In summary, although we cannot condone the trial court's lack of inquiry in the face of trial counsel's silence, given the lack of prejudice to defendant under the circumstances of this case, the trial court did not err in denying defendant's *pro se* motion alleging ineffective assistance of trial counsel.

¶ 89                    B. *Pro Se* Motion to Reconsider Sentence

¶ 90    Next, defendant argues that the trial court committed reversible error when it refused to consider the unedited video at the hearing on his *pro se* motion to reconsider sentence. He contends that the court's belief that it could not consider evidence outside the record was erroneous. The State responds that no error occurred and, alternatively, even if it did, any error was harmless. We agree with the State's harmless-error argument.

¶ 91    In his *pro se* motion to reconsider sentence, defendant complained that trial counsel did not show the unedited video, which allegedly depicted him trying to leave and Mercer trying to stop him. At the hearing on the motion, defendant noted that the State had a copy of the disk and that he wanted to play it. The court declined defendant's request, noting that it would not consider evidence not presented at trial. The State informed the court that it had viewed the entire video and that it depicted another incident, outside the hotel, but it did not show that Mercer was holding defendant back, "begging him to stay, or "the things that defendant alleges in his motion." Defendant again asked the court to view the video and asserted that defense counsel told him that they could have shown it, but they did not. The trial court persisted in disallowing the video.

¶ 92    Here, defendant contends that the trial court erred in refusing to consider the evidence contained in the full video recording on the basis that it had not been previously introduced into

evidence. The court relied on the edited portion of the video in denying defendant's motion to reconsider sentence. Defendant urges that the reasons for his actions cannot be determined without consideration of the entire context of those actions, which would be shown by the complete recording. He notes that the uncut video was produced in court at the hearing on the motion to reconsider. Defendant also notes that the trial court imposed the maximum extended-term sentence in this case, indicating that its reason for doing so was the protection of the public. He reasons that the court was strongly influenced by, and heavily relied upon (by noting that "I saw you hit somebody for no reason on the video"), the portion of the video that the State chose to put into evidence. Defendant believes that the full recording may have undercut the State's evidence. He also contends that the video evidence was relevant, where it would have supported his position that the edited-out portion showed he was acting in response to Mercer's conduct and would have constituted strong provocation evidence to be considered in mitigation. See 730 ILCS 5/5-5-3.1(a)(2), (3) (West 2018) (factors in mitigation include that "defendant did not contemplate that his [or her] criminal conduct would cause or threaten serious physical harm to another" and that "the defendant acted under a strong provocation").

¶ 93    "Strong provocation" is a mitigating factor to be considered at sentencing, but is not defined in the Unified Code of Corrections. 730 ILCS 5/5-5-3.1(a)(3) (West 2010). "Serious provocation" is a mitigating factor to be considered at trial in reducing a charge of first-degree murder to second-degree. 720 ILCS 5/9-2(a)(1) (West 2010). As the State notes, the "strong provocation" to be considered at sentencing differs from the "serious provocation" to be considered at trial, in that "strong provocation" "encompasses a wider range of conduct" than "serious provocation." *People v. Powell*, 2013 IL App (1st) 111654, ¶ 36. "Strong provocation" must be direct and immediate provocation. *Id.* Here, in denying defendant's motion to reconsider

sentence, the trial court found that defendant "hit [Mercer] for no reason on the video," thus, rejecting his assertion that he was strongly provoked when he punched her (in the videos admitted at trial).

¶ 94   Initially, we note that the trial court erred in determining that it could not view the unedited video, because it was not admitted at trial. The ordinary rules of evidence that govern at trial are relaxed during the sentencing hearing. *People v. Blanck*, 263 Ill. App. 3d 224, 234 (1994). The only requirement for admission is that the evidence be reliable and relevant as determined by the trial court within its sound discretion. *Id.*

¶ 95   That having been said, "the purpose of a motion to reconsider sentence is not to conduct a new sentencing hearing, but rather to bring to the circuit court's attention changes in the law, errors in the court's previous application of existing law, and newly[-]discovered evidence that was not available at the time of the hearing." *People v. Burnett*, 237 Ill. 2d 381, 387 (2010). Ordinarily, then, a trial court's refusal to allow evidence that was available but not previously introduced at the original sentencing hearing would not be error. *Id.* Under the unique circumstances of this case, however, we reach a different conclusion. Here, the trial court's refusal to allow the additional evidence was an abuse of discretion, in that the court had specifically advised defendant, when it denied defendant's *Krankel* motion, that he could present the unedited video at sentencing. That hearing was defendant's final opportunity to raise the issue before the trial court, but the trial court disallowed it.

¶ 96   We further hold that any error in the trial court's refusal to consider the unedited video as mitigation evidence was harmless. See *People v. Shatner*, 174 Ill. 2d 133, 156 (1996) (admission of evidence at sentencing may be harmless). Defendant's assertions concerning the unedited video are that it depicts the time immediately before he got into a car, with Mercer pulling on him before

he punched her in reaction. However, the videos shown at trial and Mercer's testimony that defendant kicked her in the head all occurred inside the hotel and well before defendant got into a car. Furthermore, in none of the videos shown at trial did Mercer pull on the defendant before he punched her. Rather, she directed or pushed him *away*. Defendant's claim concerning an event that occurred just prior to him entering a car was an event that occurred *after* he had completed the acts giving rise to his convictions. Even assuming that his claim is true and Mercer later pulled him and this provoked another strike from defendant, there is no reasonable probability that this would have constituted sufficient mitigating evidence to cause the trial court to impose a lesser sentence.

¶ 97    We reject defendant's assertion in his reply brief that the unedited video does not *merely* show events *after* the conduct for which he was convicted and that he made a much broader complaint about the video evidence before the trial court. He points to his comments at the hearing that the video supported all of his claims. However, the claim about Mercer's pulling him back as provocation for hitting her before he got into the car was the only specific claim defendant made about the unedited video. For example, even his assertions concerning the State's alleged perjury pertain to the video allegedly showing him trying to leave and Mercer stopping him. Neither before the trial court nor on appeal does defendant specify what exonerating or mitigating evidence, other than the incident before he left the hotel, is shown in the unedited video that impacts the earlier events. Defendant asks this court to speculate that such evidence exists merely from the fact that there exist portions of a surveillance video that were not shown at trial and from his vague claim that they support his general assertions. We decline to take this leap.

¶ 98    In summary, there is no reasonable probability that the trial court would have imposed less than the maximum sentence had it viewed the unedited video. Thus, we conclude that the trial

court's erroneous refusal to view and consider the unedited video was harmless and that it did not err in denying defendant's *pro se* motion to reconsider sentence.

¶ 99                                    III. CONCLUSION

¶ 100   For the reasons stated, the judgment of the circuit court of Kane County is affirmed.

¶ 101   Affirmed.