# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Powell*, 2013 IL App (1st) 111654

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE POWELL, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-1654 |
| Filed | July 17, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for the first degree murder of his wife for having an affair and his sentence to 56 years, including the mandatory 25-year firearm enhancement, were upheld over his contention that the trial court failed to properly consider mitigating factors. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-19741; the Hon. Joseph M. Claps, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier and Alison L.S. Shah, both of State Appellate Defender's Office, of Chicago, for appellant. |
| --- | --- |
| | Anita M. Alvarez, State's Attorney, of Chicago (Kathleen Warnick and Katherine Kaminski, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Neville and Justice Pierce concurred in the judgment and opinion. |

## OPINION

¶ 1    Defendant Tyrone Powell was convicted of first degree murder of his wife following a jury trial and sentenced to 56 years in prison, which included a 25-year mandatory firearm enhancement. On appeal, Powell seeks to have the sentence reduced to the mandatory minimum of 45 years, contending that the trial court failed to consider certain mitigating factors. Contrary to defendant's assertion, the trial court in imposing sentence for first degree murder did consider the evidence in mitigation, including whether: (i) the circumstances of the offense were unlikely to reoccur, (ii) defendant showed remorse, (iii) defendant had improved his life over the past 10 years, and (iv) defendant acted under strong provocation and there were substantial grounds to excuse or justify his conduct. We affirm the sentence.

¶ 2                              Background

¶ 3    The evidence revealed that 44-year-old Powell shot and killed his wife, Veltann Wilkins, near 82nd and Green Street, Chicago, close to their home at 8142 South Peoria, on the afternoon of September 22, 2008. Powell testified that he believed Wilkins was having an affair and feared that Wilkins's boyfriend, Albert Hudson, was coming to kill him.

¶ 4    At trial, the State played a portion of a phone call that Wilkins made to a 911 operator on September 22, 2008, at 12:57 p.m. On that call, Wilkins asked for police to come to 8142 South Peoria and said her husband "just now tried to drag [her] back in the house," and was "getting in his car, he's in a Dodge Charger." Wilkins also told the operator, "Here he comes, here he come, he fitting to come get me."

¶ 5    Bobby Willis, who lived upstairs from Powell and Wilkins, testified that a little before 1 p.m. on September 22, he heard a woman's screams coming from the front of the building. Looking down from his balcony, he saw Powell on top of Wilkins, punching her, as Wilkins tried to move away. Wilkins then ran across the street as Powell "peeled off" in his car. Bobby heard gunshots and later saw Wilkins at 82nd and Green Street, lying on the curb and bleeding.

¶ 6        Faithe Jordan testified that shortly before 1 p.m., she was driving on 82nd Street on her way to school. Jordan saw a woman running down the street who was hysterical and screaming and asked Jordan for help, but Jordan kept driving because she thought the woman was "hallucinating." Soon after, Jordan heard a gunshot and drove back to where she first saw the woman. Jordan saw a Charger with its car door open, and then heard two more gunshots. When Jordan reached 82nd and Green Street, she saw a woman on the grass, bleeding, and the Charger on the sidewalk.

¶ 7        Louis Thompson testified that, shortly before 1 p.m., he was home at 8200 South Green Street when he heard two "pop" sounds and a woman's screams. He looked out the window and saw a man exiting a Charger he recognized from the neighborhood. The man talked to a woman who was standing in the street and shot her. After standing over the fallen woman and shooting her four to six more times, the man returned to his car and began to drive away. Thompson called 911, and an ambulance arrived shortly afterwards.

¶ 8        Another witness, Fred Harvey, who was working at the gas station at 82nd and Halsted, testified that he saw a woman running down the street screaming as she was being chased by a man holding a gun. Harvey ran toward the woman and called for the man to stop, but the man shot the woman from about 30 to 50 yards behind her. After the woman fell to the ground around 82nd and Green, the man walked up to the woman, shot her twice more in the back, and walked away. A few hours later, Harvey found a cell phone on the street, which he gave to the police.

¶ 9        Officer John Smith testified that shortly before 1 p.m., he was called to the intersection of 82nd and Green Street along with other officers. Officer Smith and his partner approached a Charger, where he observed Powell point a gun under his head. Officer Smith yelled for Powell to drop the gun, but Powell pulled the trigger. When the gun did not fire, Powell pulled back on the gun's slide to chamber another round and pulled the trigger a second time, shooting himself under his chin. The Charger then rolled over a stop sign before coming to rest. When the police approached the Charger again, Powell asked for the officers to kill him. Officers recovered a gun from the Charger's passenger seat.

¶ 10       The victim's son, Kenneth Williams, heard Powell and Wilkins arguing at 12:20 or 12:30 p.m.. He left the building before 1 p.m. that day. Around September 24, Kenneth found a letter torn in pieces in a tissue box in Powell and Wilkins's bedroom. With his upstairs neighbors, Williams pieced the letter together and identified the letter's handwriting as belonging to Powell. Williams' upstairs neighbors gave the letter to the police.

¶ 11       The State presented an excerpt of the torn, undated letter, which was addressed "To Whom it May Concern" and signed by Powell:

"As for that low down bitch I call my wife, this is the last time she will ever hurt me. I refuse to let that bitch continue to threaten me, to treat me like shit. Therefore I've decided to kill that bitch and then I will proceed to take my own life."

The search also recovered about 40 items of Wilkins's clothing that had been cut and shredded and a photograph that had been ripped into two pieces.

¶ 12       The State presented evidence that Wilkins sustained blunt trauma injuries and gunshot wounds. The blunt trauma injuries included a small bruise by her right eyelid, a small injury

and abrasion on the under surface of her chin, and abrasions around her left elbow, the back of her left hand, and on her right knee. Wilkins's gunshot wounds were located on the top of her head, above her left ear, and on the outer surface of her arm. A third gunshot entered the left side of her chest. An autopsy revealed that Wilkins died as a result of multiple gunshot wounds.

¶ 13       Powell testified that he and Wilkins met in 2001 and married nine months later. Wilkins and her three children lived with Powell, and he and Wilkins also had a child of their own. Powell was the primary income-earner. Problems arose in the marriage, stemming in part from discipline issues with Wilkins's children and Powell's suspicions that Wilkins was stealing money from him. In 2005, after Powell noticed that money was missing from his bank account, he left home for about seven or eight months, but the couple reconciled and participated in marriage counseling. In May 2008, Powell began to suspect that Wilkins was having an affair because she would spend three or four hours on what should have been brief errands. In July 2008, Powell and Wilkins argued about the phone bill, which was normally $69, but totaled $400 that month. The bill revealed that about 200 text messages had been exchanged between Wilkins and another number, and many calls had been made to that same number. When Powell called the number and asked the man who answered why he was calling Wilkins, the man responded that Wilkins was just a friend he had met through her cousin. Also in July 2008, Powell was leaving a store when a small and seemingly unarmed man announced a stick-up, and the two men began to fight. Powell ran to his car, where he noticed he had blood on his shirt and a slash on the side of his face.

¶ 14       Despite changing phone companies, on September 18, 2008, Powell received another phone bill that listed the same number that had been on the July phone bill. Powell and Wilkins met in a park to discuss the matter, and when Powell called the number, the man told Powell he was a general for the Black P Stone Rangers street gang, had "numerous guys in his security detail," and could have "this and this and this and this done to [him]." Powell became concerned and felt his life was in danger because the man knew where Powell worked and spent his free time. Initially, Powell testified that at the time of his July attack, he thought the attacker was sent by the Black Stone Rangers, but on cross-examination admitted this was incorrect because he did not learn of the connection between the man on the phone and the street gang until the September phone call.

¶ 15       At Powell and Wilkins's discussion at the park on September 18, Wilkins attempted to reconcile, but Powell said he was leaving their home. He drove around for about two hours, before returning home, where Wilkins attempted to reconcile again. After an argument involving Wilkins's daughter, Ashley Williams, Powell called the police to escort Ashley off the premises. Wilkins became angry, took the children, and left.

¶ 16       On September 20, in an effort to find his family and retrieve their son, Powell went to the police station and Wilkins's mother's house. When the police arrived at the mother's house with papers, a sergeant informed Powell that he could go to jail if the contents of the papers were true. When Powell returned home, he wrote the letter that was found in the tissue box because he was upset that his wife had filed a fake police report.

¶ 17       On September 21, Powell and Wilkins spoke on the phone throughout the course of the

day, discussing their marriage. They arranged for Powell to leave a dinner he prepared so that Wilkins could feed the children while Powell was not home. Powell also left a Sweetest Day card for Wilkins. When Powell returned that evening, he noticed Wilkins had forgotten the card, but she agreed to return to pick it up the next day.

¶ 18    On September 22, Wilkins arrived at the apartment around 8 a.m., and Powell and Wilkins proceeded to discuss their marriage for about three or four hours. Around noon, Powell discovered Wilkins was on the phone. Powell took the phone from her, and began speaking to the man at the other end, who told Powell "he was going to f*** her up and him and his guys [were] on the way" to Powell's house to kill him. Powell determined this was the man from the previous calls, who he identified as Albert Hudson. Powell and Hudson began to argue while Wilkins begged Powell, "Please, please don't do that. Don't do that." After Powell hung up, Wilkins grabbed the phone and ran out the door, yelling for help. Because Hudson said he was on the way, Powell closed and locked the door and retrieved a gun. From the porch, he saw Wilkins on a street corner, talking on the phone and looking around, which suggested to Powell that she was waiting for Hudson. Powell got in his car and began to chase Wilkins while she ran. When he caught up to her, Powell exited the car and asked Wilkins if she was waiting for "him to do something to me." When Wilkins did not answer and ignored Powell's demands to put down the phone, Powell shot her. Continuing to hold the phone, Wilkins walked across the sidewalk while Powell repeatedly instructed her to put down the phone. When Wilkins still ignored him, he shot Wilkins again, and she fell on a pole. Powell began to drive away, but was met by police officers who told him to exit his car. To prompt the police to open fire, Powell lifted his gun, but noticed it was jammed. Once it was unjammed, he again pointed the gun at the police, and then shot himself "without thinking about it." Powell did not know Wilkins had died or that she had been on the phone with 911.

¶ 19    Albert Hudson testified for the State in rebuttal. Hudson worked in high-rise maintenance and denied being a member of a street gang or affiliated with the Black P Stone Rangers. Hudson and Wilkins met in 1983, and the two dated in high school and then stayed in touch throughout the years. Hudson and Wilkins fell out of touch around 2005, but reconnected in 2008, and began to date. Hudson knew Wilkins was married, albeit unhappily, and believed she was in the process of a divorce. In the summer of 2008, Hudson received a call from Powell, asking who Hudson was. Hudson did not recall the details of that conversation, but denied that he told Powell he was a Black P Stone Ranger.

¶ 20    On September 22, Hudson received a phone call around 12:45 p.m. from Powell, who said, "My wife begged me not to call you." After Hudson replied, "What do you want me to do?", there was a silence and the phone went dead. Hudson went to work, and around 5 p.m., he learned that Wilkins was dead.

¶ 21    The trial court denied Powell's request for jury instructions pertaining to self-defense, provocation, belief in justification, and involuntary manslaughter. The jury found Powell guilty of first degree murder and that during the commission of the offense, Powell personally discharged the firearm that proximately caused death to another person.

¶ 22    A presentence investigation report (PSI) revealed that before his arrest, Powell had

worked as a machine operator at World's Finest Chocolate for two years. Previously, Powell was employed as a kiln operator at Connelly GPM for five years and a janitor for East Lake Development Management Company for one year. His highest level of education was eleventh grade. From 1980 to 1997, Powell was a general in the Black P Stone Nation street gang. His criminal history included a 1996 conviction for manufacture/delivery of cocaine, a 1993 conviction for possession of a controlled substance with intent to deliver, a 1993 conviction for possession of a controlled substance, a 1990 conviction for unlawful use of a weapon, and a 1984 charge for possession of cannabis. Powell used heroin between the ages of 22 and 27, and successfully completed a drug and alcohol treatment program in 1992. He testified that he had not used heroin since. Powell reported that while incarcerated for the murder, he was diagnosed with major depression and an anxiety disorder and was taking prescription medication. He had attempted suicide twice–once in 1991 and once in 2008 after shooting his wife. The second attempt caused injuries to his hearing and eyesight.

¶ 23   At sentencing, the State presented victim impact statements from two of Wilkins's children, Kenneth Williams and Ashley Williams, which both referred to the emotional difficulties that Powell and Wilkins's son, Tyrone Junior, had experienced since the incident. In aggravation, the State argued that Powell "essentially hunted down Wilkins in broad daylight and shot her multiple times on the street." Wilkins was leaving him "and he decided to kill her." The State recognized that Powell was a four-time convicted felon and was a general in the Black P Stone Nation street gang. Powell did not express remorse, his testimony "was completely fabricated and completely self-serving," and Powell had done nothing to redeem himself "for the brutal actions that he inflicted on Veltann." The State argued that based on the victim impact statements, Wilkins was the life, center, and lifeblood of the family, and her children had struggled without her. The State contended that Powell deserved much more than the minimum sentence of 45 years.

¶ 24   In mitigation, Powell argued that for the past 10 years, he had been gainfully employed and supported his family, including his wife's children. The incident was unprecedented according to Powell, who characterized his criminal history as old and mostly drug-related, rather than violent. As an adult, Powell ended his gang membership, turned his life around, and took good care of his family. Powell had "certainly made great advances in terms of trying to be a pillar in his community." In addition, Powell argued that he took responsibility for his actions and made the "ultimate show of remorse" when he attempted suicide. Powell sought the 45-year minimum sentence, which would make him 89 years old on release.

¶ 25   In allocution, Powell began by noting that Ashley Williams, Wilkins's daughter, sabotaged his relationship with Wilkins. Powell considered himself a part of his wife's family, but "found out they never liked me in the beginning," and had been helping Wilkins "cover up what she was doing." Powell "tried to be a real father," but his wife would not allow him to do so, having taught their son to lie to him to cover up that she was with her boyfriend. Powell stated his son was acting out in school long before the incident, noting that his son had been suspended from school 12 times in 2008 and had always had outbursts. In addition to cheating on him, Wilkins stole money from Powell's bank account and forged his signature. Powell stated, "I mean, it's just a lot of stuff that build up, build up." Powell said he never denied that he shot his wife, but he also went to work every day and worked

long hours to take of his son and his wife's children.

¶ 26    In addition, Powell stated that while "[all] of this stuff that's happened and it's been happening for years" did not start that day, the incident itself happened because of Albert Hudson. At the time Powell shot Wilkins, he thought Wilkins was guiding Hudson to his location because Hudson had just told him that he and his friend were coming to kill Powell and had told Powell he was "a prince of the Black P Stone Rangers." Powell speculated that Hudson must have said that to scare him, because when Powell saw Hudson, he did not look like a gang member. When Powell was threatened on the phone and Wilkins told him to stop arguing, he had no reason to believe Wilkins was running from him because they never had physically fought. Powell thought Wilkins was scared because the man had just made a threat on the phone. Wilkins would not put down the phone, Powell was nervous, and he shot her.

¶ 27    Powell asked how he could have shown remorse, as he had not had contact with Wilkins's family since the incident. Powell also said he had a lot of remorse, and indicated that he had a tattoo inked on his arm that said "Rest in Peace, Vel." Powell was "very sorry that it happened because it didn't have to. I shot her under false pretenses." He acknowledged that Wilkins had called 911 and said he was "sorry that I did it." Powell added he would like to say he was sorry to his wife's family, his family, and his son.

¶ 28    In announcing Powell's sentence, the trial court said:

"[I've] considered the factors in aggravation and mitigation, I've considered the nature of the offense, I've considered your statement, the information that the State has put in the record, the information your attorneys have put in the record ***.

I've considered not only the statements you've made today but your testimony, which I recall vividly.

Probably the most troubling thing about your position *** is you think you were justified in doing what you're doing–what you did to this victim.

Even if any part of your testimony in its wildest evaluation is true, at some point, according to you, you are in your own home, locked in behind a door with a weapon. That was what you said under oath. Now, I don't believe for a second that's true. But if it was, all you would have had to [do] was stay there and you wouldn't be standing in front of me and this woman wouldn't have been shot and killed. It wouldn't have happened.

And this whole idea that this man that she was seeing, who testified[,] who I saw, in anybody's wildest imagination, that man is so far from a gang member. I mean, it's more likely he works for Disney than he is a member of a gang. No one could have seen him or heard him speak, or let alone find anything out about his background. Here's a man who went to school [and] who was employed his entire life. He's as far from a gang member as anybody could be.

To come up with that story and tell this jury that you were in fear of your life and that she was going to get you is absurd. It's really delusional. And unfortunately the delusion continues in what you think is your justification for taking someone's life.

Clearly–and it is mitigation that you did things of a positive nature. You supported

your family. But you know what, you're not the only guy in the whole world or married couple in the whole world that had arguments, couldn't get along ***.

And so to think that the answer to this is, well, I'll just kill her and that will work and then I'll kill myself, that will work, is insanity ***.

It's what makes the streets unsafe because unfortunately a lot of times people who do what you did miss and shoot someone who has nothing to do with anybody who ends up dead just because they happen to get in the way of some person's displeasure.

Well, you know what, the legislature saw fit to add enhancements on people who use firearms to kill people, which apply to you *** [and] that's 25 years added on to the sentence.

People are not safe around you. They just aren't. You have no hesitation to use a firearm. You used it twice. You used it on your wife and you used it on yourself.

Even your failed attempt to get the police to shoot you could have resulted in someone else being injured, including one of the policemen who were just doing their job."

The trial court imposed a sentence of 56 years in prison and then added:

"And so it's clear on the record *** and clear to you, most of what I believe you testified to in this jury trial under oath was nothing short of perjury."

¶ 29 On appeal, Powell contends his sentence is excessive. He argues the trial court failed to consider that (1) based on the surrounding circumstances and Powell's conduct before the incident, the shooting was an out-of-character and isolated incident that is unlikely to reoccur, (2) he made the ultimate showing of remorse in his suicide attempt, (3) he spent the previous decade working to improve himself, and (4) because the incident occurred after his wife cheated on him and moved out and Powell had just been threatened by his wife's boyfriend, Powell acted under strong provocation and there were grounds tending to excuse or justify his conduct.

¶ 30                                                    Analysis

¶ 31 The trial court has broad discretionary powers in imposing a sentence and the trial court's sentencing decision is entitled to great deference. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This deference is appropriate because the trial court is in a better position to determine the punishment to be imposed. *People v. Quintana*, 332 Ill. App. 3d 96, 110 (2002). The trial court has the opportunity to weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Stacey*, 193 Ill. 2d at 209. We will not substitute our judgment for the judgment of the trial court merely because we would have weighed the factors differently. *Id*. A defendant's sentence will be disturbed on appeal only when the trial court abused its discretion. *Quintana*, 332 Ill. App. 3d at 109. Further, a sentence within the statutory limits, as here, will not be considered excessive unless it greatly varies with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Fern*, 189 Ill. 2d 48, 55-56 (1999).

¶ 32    The trial court is not required to detail precisely for the record the exact process by which the penalty was determined or articulate its consideration of mitigating factors. *Quintana*, 332 Ill. App. 3d at 109. The presumption is that the trial court properly considered all mitigating factors before it, and the burden is on the defendant to show otherwise. *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010). Powell has failed to satisfy this burden.

¶ 33    First, Powell contends that the trial court failed to consider that because this was an isolated incident that occurred under highly unusual circumstances, the offense was the result of circumstances unlikely to reoccur (730 ILCS 5/5-5-3.1(a)(8) (West 2008)). But, the record suggests that the trial court considered and rejected this factor. During sentencing, the trial court stated that the nature of the offense, Powell's testimony, and the information that the State and Powell had put in the record were all considered. The trial court noted that it "vividly" recalled Powell's testimony, which included Powell's account of the pain from his wife's infidelity, his failing marriage, the couple's attempts to reconcile, and the alleged threats he received from Hudson. Further, the trial court stated that "people are not safe" around Powell because he has "no hesitation to use a firearm," as evidenced by his using a firearm on his wife and himself and his attempt to prompt the police to shoot him, which could have resulted in someone else being injured. Considering the circumstances, the trial court implicitly rejected Powell's argument that this was an isolated incident and instead concluded that his behavior suggested he was a danger to others. See *People v. Kosyla*, 129 Ill. App. 3d 685, 703 (1984) (trial court did not disallow mitigating effect of defendant's move away from location from where offense occurred, but rather defendant's character and attitude indicated it was likely he would commit another crime).

¶ 34    Second, Powell contends that the trial court failed to consider his show of remorse. Our courts have stated that a defendant's demonstration or lack of remorse is an important factor for the trial court to consider. *People v. Barrow*, 133 Ill. 2d 226, 281 (1989); *People v. Thurmond*, 317 Ill. App. 3d 1133, 1143 (2000); *People v. Merritte*, 242 Ill. App. 3d 485, 494 (1993). During sentencing, defense counsel argued that Powell's suicide attempt was the "ultimate show of remorse," and in allocution, Powell said he felt remorse and apologized. However, Powell also stated the shooting occurred because of Albert Hudson and blamed others for hurting his relationship with Wilkins. The trial court's comments suggest it considered Powell's level of remorse as a factor, but was not persuaded that Powell actually felt remorse, stating, "Probably the most troubling thing about your position *** is you think you were justified in doing what you're doing–what you did to this victim." Even if the trial court did not weigh or view the factor in the way Powell urges, the record shows that the court considered Powell's purported remorse through suicide.

¶ 35    Third, Powell argues that the trial court failed to consider his decade of progress. Powell's employment history was contained in the PSI, as was his over-10-year-old criminal history. The trial court stated it considered the information his attorneys put in the record and the factors in mitigation and aggravation. The trial court also noted that in mitigation, Powell "did things of a positive nature" and supported his family. While the trial court cannot ignore evidence in mitigation, it may determine the weight to attribute to mitigating evidence. *People v. Markiewicz*, 246 Ill. App. 3d 31, 55 (1993).

¶ 36    Fourth, Powell argues that the trial court failed to consider that he acted under a strong

provocation (730 ILCS 5/5-5-3.1(a)(3) (West 2008)) and there were substantial grounds tending to excuse or justify his conduct (730 ILCS 5/5-5-3.1(a)(4) (West 2008)). While "strong provocation" is not defined in the Unified Code of Corrections, the similar term "serious provocation" has a well-established meaning when considering whether an individual acted under serious provocation sufficient to reduce the offense of first degree murder to second degree murder, and is limited to the categories of substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and spousal adultery. *Merritte*, 242 Ill. App. 3d at 492. Mere words, no matter how insulting, and including those which carry messages of adultery, are insufficient. *People v. Hernandez*, 204 Ill. App. 3d 732, 741 (1990). While strong provocation as a mitigating factor at sentencing encompasses a wider range of conduct than serious provocation for the purposes of second degree murder (*Merritte*, 242 Ill. App. 3d at 493), the provocation must nonetheless be direct and immediate (*People v. Adamcyk*, 259 Ill. App. 3d 670, 680 (1994)).

¶ 37        Here, the trial court considered and rejected Powell's argument that he was in fear of his life, stating:

> "To come up with that story and tell this jury you were in fear of your life and that she was going to get you is absurd. It's really delusional. And unfortunately the delusion continues in what you think is your justification for taking someone's life."

And the trial court found it incredible that Powell could have believed Hudson was a gang member, finding that "no one could have even seen him or heard him speak" could think he was a gang member. At the end of the sentencing hearing, the trial court stated that it found most of Powell's testimony to be "nothing short of perjury." The trial court considered Powell's argument that he was provoked and justified but did not believe it. *Cf. People v. Calhoun*, 404 Ill. App. 3d 362, 386 (2010) (remanding for resentencing where trial court failed to recognize full extent of provocation, the factual basis for provocation was corroborated, and trial court never questioned or attempted to negate fact that defendant was sincere in her belief that source of provocation occurred).

¶ 38        Even putting credibility issues aside, the trial court did not find that Hudson's actions amounted to strong provocation or grounds to justify or excuse Powell's conduct. The trial court stated:

> "[According] to you, you are in your own home, locked in behind a locked door with a weapon. That was what you said under oath. Now, I don't believe for a second that's true. But if it was, all you would have had to [do] was stay there and you wouldn't be standing in front of me and this woman wouldn't have been shot and killed. It wouldn't have happened."

Because there was a time when Powell was alone in his locked apartment, he did not experience a direct and immediate threat and could have avoided the incident entirely. The trial court considered and rejected the mitigating factor that Powell acted under a strong provocation and there were substantial grounds to excuse his conduct.

¶ 39        Lastly, the range for Powell's offense was 45 to 85 years–20 to 60 years for first degree murder (730 ILCS 5/5-8-1(a)(1) (West 2008)) and an additional 25 years because during the commission of the offense, Powell personally discharged a firearm that proximately caused

death to another person (730 ILCS 5/5-8-1(d)(iii) (West 2008)). That Powell's 56-year sentence is in the lower half of the sentencing range suggests that the trial court considered the mitigating factors presented. Furthermore, the most important factor to be considered by the trial court is the seriousness of the Powell's offense. *Brazziel*, 406 Ill. App. 3d at 435.

¶ 40     For the foregoing reasons, we find that the trial court considered the mitigating factors presented and did not abuse its discretion in sentencing Powell to 56 years in prison. Accordingly, we affirm the judgment of the trial court.

¶ 41     Affirmed.