2026 IL App (1st) 240825-U
No. 1-24-0825

Order filed: February 19, 2026
Modified Upon Denial of Rehearing: March 26, 2026

FOURTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | No. 20 CR 07252 |
| SHELDON DOLL, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | Stanley J. Sacks, |
| | ) | Judge Presiding. |

JUSTICE QUISH delivered the judgment of the court.
Justices Lyle and Ocasio concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant failed to establish that the circuit court committed plain error when instructing the jury pursuant to Supreme Court Rule 431(b), as the evidence at trial was not closely balanced. The circuit court did not abuse its discretion when it imposed a 20-year sentence for second degree murder.

¶ 2    Following a jury trial, the defendant, Sheldon Doll, was convicted of second degree murder and sentenced to 20 years in the Illinois Department of Corrections. On appeal, he argues that (1)

the circuit court committed plain error by failing to ensure that potential jurors understood and accepted the legal principles outlined in Supreme Court Rule 431(b); and (2) the circuit court abused its discretion in sentencing defendant to the maximum 20-year sentence when it stated that the jury's verdict of second degree murder was "mitigating by itself" and refused to consider mitigating evidence. For the following reasons, we affirm defendant's conviction and sentence.

¶ 3      Defendant was charged by indictment with six counts of first degree murder, eight counts of attempted first degree murder, and four counts of aggravated discharge of a firearm. The charges stemmed from a shooting on June 23, 2020, which resulted in the death of Shaniya Brown.

¶ 4      The case proceeded to a jury trial.  During *voir dire*, the circuit court provided introductory instructions and background information about the case, but many portions of the transcript appear as "(unintelligible)." As the circuit court instructed the jury about the principles set forth in Rule 431(b), the transcript reads as follows:

> "What I am going to do is I am going to read to you the legal principle, which is actually the legal instruction. After I have done that, I am going to ask you (unintelligible) possible juror not understand and accept that instruction. Not understand and accept that instruction. If you don't understand it or don't accept it, raise your hand and let me know. We will talk about it more when necessary.
>
> If you don't understand and accept it, nothing to do at all. Move on to the next question. And generally I get no hands for any of these four. Only time will tell about that because they are basic, they are general, they apply to all cases that are criminal in nature and apply to the case of Mr. Sheldon Doll as well.
>
> Also, just regarding my voice a bit. I got what they call a flip or flap or something in my mouth. One of teeth is gone. So I wear it during the day and take it out at night. I may sound like Elmer Fudd with this thing in my mouth. If I do, that's the reason, the flip or the flap, whatever they want to call that thing. It doesn't hurt, but it's annoying.
>
> The first legal instruction I am going to tell you about, again, you would have seen it downstairs earlier today: Under the law, the defendant, Sheldon Doll, (unintelligible) charge against him, (unintelligible) the charge against him, that's

(unintelligible) every stage of the case (unintelligible) not overcome unless (unintelligible) reasonable doubt the defendant is guilty. Presumption of innocence (unintelligible) guilt beyond a reasonable doubt.

And (unintelligible) possible juror not understand and accept that instruction? If so, raise your hand now. As it should be, no hands, no response.

These pretty much go hand in hand together. Second of all, the State, Mr. Kleist, Ms. Eggleston, the State has the burden of proof (unintelligible) beyond a reasonable doubt. Their burden all the way through the entire trial. The burden (unintelligible) the State to (unintelligible) a reasonable doubt all the way through the entire trial. Any possible juror not understand and accept that instruction? If so, raise your hand now. And again, no hands, no response.

Thirdly of the four, there will be more eventually, but of these four. Defendant, Mr. Sheldon Doll, is not required to prove his innocence or call witnesses on his own behalf. He is not required to prove his innocence or call witnesses on his own behalf. Any possible juror do not understand and accept that instruction? If so, raise your hand now. And again, no hands, no response.

And the fourth at this point. There will be more eventually, but for now. (Unintelligible) has the right to remain silent and not testify. The right to remain silent and not testify. If he chooses not to testify, you as jurors (unintelligible) decision. Again, he has a right to remain silent and (unintelligible) in any way whatsoever in this case. Anyone that's a possible juror do not understand and accept that instruction? If so, raise your hand now. And again, no hands, no response."

Defendant did not object during these instructions.

¶ 5    Four eyewitnesses to the shooting testified at trial: Marita Myles, Jarvell Davis, Damolia Luckett, and Sheante Mallet. Myles, defendant's ex-girlfriend, testified that on June 23, 2020, she got into an argument with Alexis Banister, defendant's current girlfriend, via text message and social media. Myles was seven months pregnant at the time. Myles and Banister agreed to meet and fight at the Garfield Green Line Station. Myles took a Green Line train towards Garfield accompanied by Davis, Luckett, Mallet, and a male who was referred to by the witnesses as "Man-Man." When they exited the train at Garfield, they saw Banister with defendant, defendant's cousin Ronnie, and Banister's cousin Carlina. Police intervened between the groups at the Garfield station

and told Myles's group to wait at the station while Banister's group left the area. At that time, Brown and her six-year-old cousin arrived and joined Myles's group. Myles testified that her group left the Garfield stop and walked towards Brown's house on 60th Street.

¶ 6    When Myles's group approached the intersection of 56th Street and Calumet Avenue, Myles saw the car that Banister's group was driving near 56th Street and King Drive. Myles and Brown walked towards Banister's group in the middle of 56th Street. Myles had mace with her, which she intended to use on Banister. Myles testified that no one else in her group was armed. Myles testified that the two groups were about half a block apart. At that point, both groups stopped and Myles saw defendant start shooting at her group from the sidewalk. There was no physical altercation between the two groups before defendant started shooting. Myles and Brown jumped around a car and Brown was struck in her lower back.

¶ 7    Davis, Luckett, and Mallet testified consistently with Myles's account of the shooting and all identified defendant as the shooter. They all denied having any weapons on them, and none of the witnesses saw anyone in their group with a weapon. The State admitted surveillance video from an apartment building on the corner of 56th Street and King Drive which, according to all four eyewitnesses, accurately depicted the shooting. The camera that captured the shooting is positioned in the middle of the block on 56th Street pointing east towards King Drive. The video, which is part of the record on appeal, shows two men and a woman walking on the sidewalk along 56th Street away from King Drive. At one point, one of the men, identified by Myles as defendant, runs out into 56th Street. Defendant holds a firearm in front of him and fires multiple shots down the block away from King Drive. When defendant starts shooting, he is positioned in the middle

of the frame of the video, and Myles's group is not in the frame. Defendant and the other two individuals then ran away towards King Drive.

¶ 8 Chicago Police Department Evidence Technician Marina Jurassi testified that she responded to the scene. She observed a set of shell casings near King Drive and a bloody roll of toilet paper near Prairie Avenue. The parties stipulated that an Illinois State Police forensic scientist would testify that the recovered shell casings were fired by the same firearm. The parties also stipulated that a Cook County medical examiner would testify that Brown's cause of death was a gunshot wound to the back and that the manner of death was homicide.

¶ 9 Chicago Police Department Detective Patrick Thelen testified that he investigated the shooting and learned that defendant was identified as the shooter. Defendant was arrested on July 28, 2020, in Iowa. He testified that defendant had short hair at the time of his arrest, but had dreadlocks in the surveillance video. On cross-examination, Thelen testified that he was given the nickname of someone referred to as "Man-Man." He was unable to identify or locate that individual.

¶ 10 Defendant testified on his own behalf that he was 19 years old at the time of this incident. Defendant dated Myles for two years and ended their relationship in May 2020, and started dating Banister shortly afterwards. He stated that on June 23, 2020, he was with Banister, Ronnie, and Carlina in Banister's home. Banister was texting with Myles and told defendant that they were going to meet up for a fight. Defendant initially told Banister that he would not go with her, but eventually agreed to go with her rather than allow her to go by herself. The group took a Green Line train to Garfield and waited near a food truck parked near the station.

¶ 11    Defendant testified that Myles's group arrived at the Garfield stop shortly afterwards. Myles's group had about 6 or 7 people, and he only knew Myles and Mallet. Myles's group started "yelling and screaming and threatening us" and the police came and escorted his group towards Banister's godmother, who was in her car near the station. They drove to Banister's godmother's home on King Drive. Defendant testified that they got out of the car and went to the corner of 56th Street and King Drive, where defendant saw Myles's group walking down 56th Street. Defendant stated that the group had five women and two men. He heard yelling and screaming coming from Myles's group, but could not hear what they were saying. Banister was yelling back at Myles's group. Defendant testified that he expected a fight at that time. Defendant had a gun with him, which he brought to protect himself and his "loved ones."

¶ 12    As Myles's group approached, defendant saw "a male from their crowd come from the back of the crowd to the front of the crowd with his hand in a book bag" skipping toward him. He did not remember what the man looked like. As defendant observed the man put his right hand in the book bag, he thought "shoot" because he "didn't want to get killed." Defendant thought that the man had a gun, so he walked into the street and began shooting because "[i]f he start shooting, he would probably kill us, kill all of us." He was scared and did not intend to shoot anybody before the man appeared. He left Illinois shortly after the shooting because he was scared. When asked if he felt he had another choice aside from shooting, defendant initially answered "Yes," but when counsel followed up by asking "[y]ou felt you had another choice?," he responded "Oh, no."

¶ 13    Defendant clarified that the backpack was a blue string backpack with a pocket at the top strapped to the front of the man. He testified that the man had his hand in the top of the bag and that he never saw him take his hand out of the bag. After defendant fired the first shot, the man

"still looked like he was pulling his hand out of the bag" but everyone else was running away. After defendant fired a second shot, the man started running away from defendant. Defendant fired five more shots after the man started running away. On redirect examination, defendant stated that he fired the shots rapidly and there was not much of a delay between the shots. He sold the gun before he left Illinois. Defendant then rested.

¶ 14    During the jury instruction conference, defendant requested an instruction on second degree murder. The State agreed that defendant's testimony that he saw the man reach into the bag was a "scintilla of evidence" which would warrant giving the instruction. The instruction was ultimately given to the jury.

¶ 15    The jury returned a verdict of guilty on second degree murder. Defendant filed a motion for a new trial or judgment notwithstanding the verdict, which only addressed the sufficiency of the evidence. The circuit court denied the motion.

¶ 16    The matter proceeded to sentencing. Defendant's presentence investigation report ("PSI") indicated that he was adopted by his great aunt when he was three years old. His great aunt considered giving defendant back to Department of Children and Family Services ("DCFS") custody because he was "out of control." Defendant had two prior juvenile convictions and five juvenile cases with no disposition available. Defendant reported being physically abused by his adoptive parents, which resulted in him running away from home. He was also removed from his adoptive parents' home by DCFS between 2016 and 2018. The PSI indicated that defendant had a better relationship with his adoptive parents at the time of his interview.

¶ 17    At the sentencing hearing, the parties agreed that the possible sentence for second degree murder ranged from probation to 4 to 20 years' incarceration. In aggravation, the State argued that

regardless of defendant's belief as to self-defense, his actions of firing multiple rounds at a group of people warranted a sentence of incarceration on the high end of the permissible range. In mitigation, defense counsel noted that defendant had no adult convictions. Counsel argued that if the court were to order a sentence of incarceration, it should be on the low end of the sentencing range.

¶ 18    The circuit court made the following statements in announcing defendant's sentence:

> "THE COURT: Okay. I am a firm believer in jury's verdicts also, I've done a whole bunch of juries in my career. So I deal with the cases as the way the jurors found, second-degree murder. Whatever sentence he gets will be for that charge. Probably because somebody else might have found first-degree -- or not saying me, but second-degree murder ranges anywhere from probation up to 20 years. Probation, not even a possibility in my mind in a case like this. The girl that gets shot is running away at the time and shot in the back. The jurors determined their viewpoint was second-degree murder, that's where we're at at this point, second-degree murder.
>
> I looked at the PSI, there's nothing earth-shattering about it as far as any criminal activity on the part of Sheldon Doll. In 2019, aggravated battery to a peace officer, 30 days in the County, in the Juvenile Detention Center. Okay. 30 days. Others before and after that indicate no dispositions or not available, so I'm not going to consider those at all. I don't know what happened with those anyway. There's a conviction in 2017 -- Juvenile adjudication in 2017. … aggravated battery looks like, one year probation through TASC community service, mental health counseling, mandatory school. Previous … probation terminated unsatisfactory….
>
> So he basically doesn't have an earth-shatteringly bad prior record, at least based on what's in the PSI. He does acknowledge in his -- in the PSI he got in trouble at school a lot for fighting, missing class, things of that nature, but, again, nothing earth-shattering. He has future plans to attend truck driver school, getting a CDL. Maybe so. When he gets out, maybe he can get into some class like that.
>
> Talk about mitigation, the jury's verdict of second-degree murder is mitigating by itself. So the question, anything else mitigating regarding Sheldon Doll. Or anything aggravating regarding Sheldon Doll. While the State is correct, … a girl shot in the back running off. The jury said second-degree murder, live with that, that's the way it goes. He fired a whole bunch of shots too. I think it was seven shots altogether, one of which hits a girl in the back and she's off. Other people

were out there the State said. Over whoever's nonsense issue it was about, I don't remember exactly now.

So it wasn't just the girl that was shot and killed, people out there were threatened of this ability of Doll in his haste to shoot at the supposed person that reached into his duffle bag, whatever it was, they were in danger of being hit also. Just happened that he hit the girl was running off.

And we talk about senseless crimes, put this right on the list near the top, senseless crimes. All murders are senseless. This is ridiculous, situation like this. Sheldon Doll goes out and he kills some girl. Claims he was shooting at someone else, but nonetheless, even if he was theoretically shooting at someone else, that person is running off too. He doesn't get rewarded for being a bad shot by missing who he's shooting at supposedly. He hit some innocent girl running down the street away from Sheldon Doll in his haste to fire off seven shots. He comes off the sidewalk into the street and fired … seven shots.

One of the shots hit the girl -- … in the back as she's running off from this tirade of shots from Sheldon Doll. Jury says second degree, that makes it mitigating right there, it means instead of 25, 45 it brings it down to 20. So that mitigating factor is the verdict by itself.

Mr. Doll, I see in your PSI talking about learning how to drive a truck or something like that when you get out. You're still a young guy. You'll be getting out still a young man. It won't be now, it won't be real soon from now. When you get out, you'll still be a young guy.

How old are you now, Mr. Doll?

THE DEFENDANT: 22.

THE COURT: 22.

So how old is the girl that got shot? I forgot it?

[ASSISTANT STATE'S ATTORNEY]: …Shaniyah Brown was 21 at the time.

THE COURT: Okay. 21 at the time.

And the murder took place 3 or 4 years ago or so?

[ASSISTANT STATE'S ATTORNEY]: June 24th -- June 23rd, rather, of 2020.

THE COURT: Okay. Other than the fact that the jury's verdict makes it second degree, which in itself is mitigating, does not excuse the crime of murder of the girl that makes it second degree instead of first. So that's mitigating right by itself. But everything else about Sheldon Doll is hardly mitigating. It's not earth-shatteringly aggravating, but it's hardly mitigating either. Doesn't do well in school, couple little minor things adjudicated delinquent about. And then here, this case itself hardly warrant someone talking about probation.

Mr. Doll, your lawyers did an exceptionally good job …. You should be very thankful for that. And the second-degree murder, even though the State said possible probation, I don't have to make any finding about that nature of the crime, it's second-degree murder conviction for probation, I don't need to get into that.

It's never any fun to give a young guy time. I don't go home to my wife and say, Betty, I gave the guy X number of years; …. You do bad things, get bad against [*sic*] consequences. I'm sure Doll doesn't believe this anyhow, but it's true. I've been doing this a long time. Maybe some lawyers think too long, but nonetheless.

In all the time I've been doing this, I had to put one person in prison in all these years. It's what the guy does on the street that gets him there, I just make it official, that's all. You go out there and you shoot someone, from your viewpoint theoretically self-defense, jury said that belief was unreasonable, that's why they made it second degree, that's what gets you there, Mr. Doll.

You made your choices that night. All you have to do is just leave it alone, that's all. Just leave it alone. For some reason you felt the need to get out there on the street and fire seven shots with people around, one of which hit the girl in the back and killed her.

So on the charge of murder in the second degree, the Court will go back and forth about what counts it is, I'm not concerned about that issue, take it up with Iris Martinez. I think it's … Count 1, and 2 would merge into it. So it's Count 1, sentenced [*sic*] will be 20 years Department of Corrections. Mr. Doll, you've got to do all of it, 20 years. One a 20-year bit, you do less than ten years. You can do 10 years standing on your head, Mr. Doll."

Defendant filed a motion to reconsider his sentence, arguing that his sentence was "excessive in view of Defendant's background and the nature of his participation in the offense." The circuit court denied the motion. This appeal follows.

¶ 19    Defendant first argues that the circuit court failed to ensure that potential jurors understood and accepted the principles set forth in Supreme Court Rule 431(b) and thus, argues that his conviction should be reversed and the case should be remanded for a new trial.

¶ 20    Supreme Court Rule 431(b) requires that "[t]he court shall ask each potential juror, individually or in a group, whether that juror understands and accepts the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." Ill. Sup. Ct. R. 431(b) (eff. Jul. 1, 2012). "The trial court must ask each potential juror whether he or she understands each of the principles in the rule." *People v. Thompson*, 238 Ill. 2d 598, 607 (2010).

¶ 21    Defendant argues that, based on the many "unintelligible" portions of the transcript during circuit court's introductory instructions to the jury, the record does not show that the circuit court complied with Rule 431(b). He alternatively argues that, if this court is unable to determine from the record whether the circuit court complied with Rule 431(b), this court should remand the case for a hearing under Supreme Court Rule 329 to attempt to correct the unintelligible portions of the transcript.

¶ 22    Defendant acknowledges that he forfeited this argument by failing to object during the circuit court's instructions and failing to raise this issue in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988); *People v. Sebby*, 2017 IL 119445, ¶ 48. However, defendant argues that we can review his claim under the plain error doctrine. See Ill. Sup. Ct. R. 615(a) (eff. Jan. 1, 1967). This court may review "[p]lain errors or defects affecting substantial rights," even

if they are not properly preserved. Ill. Sup. Ct. R. 615(a). We can review unpreserved error when "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (citing *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005)). Defendant acknowledges that his claim that the circuit court failed to comply with Rule 431(b) falls under the first prong of the plain error analysis. See *Sebby*, 2017 IL 119445, ¶ 52 (Rule 431(b) violation falls under first prong plain error "absent evidence that the violation produced a biased jury.").

¶ 23    Here, we need not decide whether the circuit court erred in questioning the jury about the Rule 431(b) principles because we find that any such error does not rise to the level of plain error because the evidence of defendant's guilt was not closely balanced.

¶ 24    "Where the defendant claims first-prong plain error, a reviewing court must decide whether the defendant has shown that the evidence was so closely balanced the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. To determine whether the evidence was closely balanced, we "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Id.* ¶ 53. This requires "an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.*  The defendant bears the burden of showing that the evidence was closely balanced. *Id.* ¶ 51.

¶ 25 While defendant was ultimately convicted of second degree murder, the closely balanced inquiry requires looking at the elements of the charged offense. *Id.* ¶ 53. Defendant was charged with first degree murder, which required proof that he killed an individual without lawful justification; and either (1) intended to kill or do great bodily harm to that individual or another; (2) knows that such acts will cause death to that individual or another; or (3) knows that such acts create a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/9-1 (West 2022).

¶ 26 When, as here, a defendant raises the affirmative defense of self-defense, the burden shifts to the State to disprove the defense beyond a reasonable doubt. *People v. Lee*, 213 Ill. 2d 218, 224-25 (2004). A person "is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another" against the other person's imminent use of unlawful force. 720 ILCS 5/7-1(a) (West 2022). A person is justified in the use of that force, however, only "if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." *Id.* The elements of self-defense are (1) an unlawful force threatened against a person; (2) the person threatened not being the aggressor; (3) the imminent danger of harm; (4) the necessary use of force; (5) the threatened person's actual and subjective belief of danger requiring the use of the force; and (6) the objectively reasonable beliefs of the threatened person. *Lee*, 213 Ill. 2d at 225. If the State disproves any of the above elements, defendant's claim of self-defense fails. *Id.*

¶ 27 There is no dispute that defendant performed the act that killed Brown. He admitted to firing seven shots towards a group of people including Brown, which was captured on surveillance video. Defendant was identified as the shooter by four eyewitnesses. Forensic evidence established

that Brown was killed from a gunshot wound to her lower back and that the shell casings recovered from the scene were all fired from the same weapon.

¶ 28    The main issue is whether the evidence was closely balanced as to defendant's claim that he acted in self-defense. Defendant argues that the jury's verdict of second degree murder demonstrates that the jury credited defendant's version of events and that no evidence contradicted his claim that a man in Myles's group reached into a bag with what defendant believed to be a firearm. Defendant argues that the evidence was closely balanced because his self-defense claim rested on a credibility determination.

¶ 29    In support of his argument, defendant cites *Sebby*, 2017 IL 119445, and *People v. Naylor*, 229 Ill. 2d 584 (2008). In *Sebby*, the defendant was charged with resisting a peace officer and, on appeal, raised a claim that the jury was not properly instructed according to Rule 431(b). *Sebby*, 2017 IL 119445, ¶ 1. At trial, the State's witnesses testified that the defendant resisted a peace officer by pushing the officer and attempting to pull away when the officers tried to place him in handcuffs, while defendant's witnesses testified that they did not see the defendant push the officers or resist while they were handcuffing him. *Id.* ¶¶ 9-35. The court found that the evidence of the defendant's guilt was closely balanced, as "neither the prosecution nor the defense accounts of that morning's events were fanciful." *Id.* ¶ 61. The court noted that the case turned on how the finder of fact resolved a "contest of credibility" and found that both versions of events were credible. *Id.* ¶ 63.

¶ 30    In *Naylor*, the defendant was charged with possession of heroin with intent to deliver and delivery of heroin. *Naylor*, 229 Ill. 2d at 587. The State's witnesses testified that, during an undercover narcotics operation, two undercover officers purchased heroin from the defendant. *Id.*

at 588-90. The defendant testified that he was leaving his apartment to pick up his child when officers "attacked him, announced their office, and sprayed mace in his face." *Id.* at 590. The defendant denied selling drugs or possessing money from drug sales. *Id.* The court held that the evidence of the defendant's guilt was closely balanced, finding that both the officers and the defendant testified to "their respective versions of the same underlying incident—a drug raid in a residential housing complex." *Id.* at 607. The court found that "the trial court's finding of guilty necessarily involved the court's assessment of the credibility of the two officers against that of defendant." *Id.*

¶ 31    *Sebby* and *Naylor* are both distinguishable from this case because neither case involved a claim of self-defense and defendant's guilt did not rest on a credibility determination. Here, the testimony of the State's witnesses and defendant were largely consistent regarding the leadup to the shooting and how the shooting unfolded. All of the witnesses, including defendant, agreed on the critical facts that proved defendant guilty of Brown's murder.  The State presented clear and corroborated testimony that defendant committed the charged act. There was evidence corroborating the State's version of events, which included the testimony of all four witnesses. Evidence is not closely balanced merely because it turns on conflicting witness testimony. *See People v. Ruiz*, 2023 IL App (1st) 210541-U, ¶ 54.

¶ 32    The State's evidence disproved defendant's self-defense claim. The evidence at trial established that no one in Myles's group had a gun.  Defendant did not testify that he saw the man pull out a weapon—only that he thought the man had a weapon in his bag. There was no evidence from any witness, including defendant, that anyone other than defendant had a gun at the time. See *People v. Scott*, 2025 IL App (1st) 231145-U, ¶ 60 (evidence not closely balanced when

"defendant fired multiple rounds at [the victim] and no physical evidence was recovered showing [the victim] even had a firearm."); *People v. Golden*, 244 Ill. App. 3d 908, 916 (1993) (State's evidence that the victim was unarmed was sufficient to disprove self-defense beyond a reasonable doubt, even when defendant testified that the victim was armed). Defendant's claim that he acted in self-defense was uncorroborated and inconsistent with his subsequent actions. No witness corroborated defendant's account that a man in Myles's group even had a backpack. There was no evidence that a gun or backpack was recovered from the scene. After the shooting, defendant fled the state, disposed of the gun and changed his appearance, providing further evidence of his guilt. See *People v. Jimerson*, 127 Ill. 2d 12, 45 (1989) ("Evidence of flight may be a circumstance tending to show consciousness of guilt.").

¶ 33 Additionally, no witness testified to prior incidents of violence or threats between Myles's group or Banister's group. While the two women had decided to fight, there was no evidence that they had a history of violence or ever used or possessed weapons. Defendant could not identify the "skipping man" or even describe him, and there was no evidence that the man had any violent history or had threatened defendant or anyone in Banister's group previously. While the State's witnesses testified that a second man they referred to as "Man-Man" was with Myles's group, there was no evidence that "Man-Man" was the person defendant claimed to have the backpack. Also, Myles testified that the two groups were approximately half a block apart when defendant started shooting and there was no altercation between them. This is corroborated by the surveillance video, which shows defendant in the middle of the frame when he starts shooting, while Myles's group is never in the frame at any point. Defendant admitted to continuing to shoot his gun seven times, even though everyone was running away from him after the first or second shot.

¶ 34   While there was sufficient evidence for the jury to find that defendant acted with an unreasonable belief in the need for self-defense such that he was guilty of second degree murder, this does not mean that the evidence of defendant's guilt was closely balanced. See *People v. Anderson*, 2021 IL App (1st) 182558-U, ¶ 58 (finding that, while the defendant was found guilty of second degree murder, the evidence that he acted in self-defense was not closely balanced). We find that defendant has not met his burden to show that the evidence was closely balanced.

¶ 35   While we ultimately agree with the State that the evidence in this case is not closely balanced, we note that its argument misses the mark. The State argues that the evidence did not support a verdict of second degree murder and "[t]hat the jury found defendant guilty of [second degree murder] despite the absence of any supporting evidence shows only that the jury was confused or lawless—not that the evidence was closely balanced." In support, the State cites numerous cases where this court found the circuit court did not abuse its discretion when it refused to give an instruction for second degree murder, none of which involved a plain error inquiry. Here, the State *agreed* to give a second degree murder instruction. Its argument that there was no evidence supporting the instruction is inconsistent with its position in the circuit court and we reject it.

¶ 36   As we have found that the evidence was not closely balanced, defendant's claim that the circuit court did not correctly instruct the jury according to Rule 431(b) is not reviewable under the plain error doctrine. *People v. Belknap*, 2014 IL 117094, ¶ 70.

¶ 37   Defendant next argues that the circuit court abused its discretion in imposing the maximum 20-year sentence for second degree murder when it refused to consider the circumstances of the offense, found that the jury's verdict of second degree murder was "mitigating by itself" and failed

to consider mitigating evidence. Defendant asks that this court either reduce his sentence or vacate his sentence and remand for resentencing before a different judge.

¶ 38 A circuit court has broad discretion in sentencing and the court's sentence should be reversed only when it abuses its discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). A sentence will be considered an abuse of discretion when it "is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *People v. Stacey*, 193 Ill. 2d 203, 210 (2000). A sentence within the statutory range is presumptively proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. On appeal, we presume that the sentencing court considered all relevant factors and mitigating evidence. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48. We "will not reweigh the factors in reviewing a defendant's sentence" or substitute our judgment for the trial court merely because we would have weighed the factors differently. *Knox*, 2014 IL App (1st) 120349, ¶ 46. In reviewing defendant's sentence, we review the record as a whole, rather than focusing on isolated comments made by the court during sentencing. *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009).

¶ 39 The State initially argues that defendant forfeited his claims of sentencing error by failing to object at the sentencing hearing or failing to raise these issues in his motion to reconsider his sentence. "To preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required." *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Defendant's motion to reconsider his sentence primarily argued that the sentence was "excessive in view of Defendant's background and the nature of his participation in the offense." We find that defendant sufficiently preserved his argument that his sentence was excessive and that the circuit court failed to consider mitigating evidence and reject the State's forfeiture argument. See *People*

*v. Valadovinos*, 2014 IL App (1st) 130076, ¶ 51 (post-sentencing motion that argued defendant received an unfair and excessive sentence preserved challenge to the use of improper aggravating evidence).

¶ 40    Defendant contends that the circuit court erred by refusing to consider the circumstances of the crime as mitigating and instead finding the jury's verdict of second degree murder as "mitigating by itself." Defendant relies in part on *People v. Hall*, 159 Ill. App. 3d 1021 (1987). In *Hall*, the defendant was charged with first degree murder but, after a bench trial, was found guilty of voluntary manslaughter. *Id.* at 1024. At sentencing, the circuit court stated that "[c]redit has already been given to Mr. Hall for those mitigating factors that reduce this crime down from murder to voluntary manslaughter and it is not the intent of this Court to let him use those chips twice." *Id.* at 1031. The circuit court imposed a 10-year sentence, below the maximum sentence of 15 years' incarceration. *Id.* at 1030. This court found that the circuit court erred when it stated that it would not consider for purposes of sentencing the mitigating factors that reduced the murder charge to voluntary manslaughter. *Id.* at 1031. However, we concluded that this error was harmless, as the circuit court properly considered mitigating factors such as provocation and defendant's lack of a criminal record, in addition to aggravating factors, including the seriousness of the crime and defendant's credibility and demeanor in imposing a 10-year sentence. *Id.* at 1032.

¶ 41    In this case, we find that the circuit court's comments, examined as a whole and in the context of the entire record, did not demonstrate a refusal to consider the circumstances leading to the offense. The circuit court's statements that the jury's verdict of second degree murder was "mitigating" differs from *Hall*, where the circuit court explicitly stated it would not consider the circumstances of the crime that led to defendant being convicted of a lesser-included offense as a

mitigating factor. Here, the record reflects that the circuit court considered the nature of the offense and the circumstances of the crime, and ultimately found that the circumstances leading to the shooting were "senseless" and more aggravating than mitigating. The circuit court repeatedly emphasized that defendant shot Brown in the back as she was running away and his actions of firing seven shots towards Myles's group based on his belief that a man had a weapon put others in danger. The court noted that several of those shots were fired after the man turned and ran away. Based on the entire record, we do not find that the circuit court's comments that the jury's verdict of second degree murder was "mitigating by itself" reflected a refusal to consider the circumstances of the offense as mitigating or constituted an abuse of discretion.

¶ 42    Defendant argues that the circuit court refused to consider statutory mitigating factors such as strong provocation. See 730 ILCS 5/5-5-3.1(a) (West 2024). We initially observe that the circuit court is not required to recite and assign a value to every statutory mitigating factor, so the fact that the circuit court did not mention each mitigating factor here does not, by itself, render its sentence an abuse of discretion. *People v. Meeks*, 81 Ill. 2d 524, 534 (1980). The record does not reflect that the circuit court expressly refused to consider this factor, only that it was given little or no weight. The strong provocation sentencing factor encompasses a wider range of conduct than the serious provocation mitigating factor which can reduce the offense to second degree murder. 720 ILCS 5/9-2(a)(1) (West 2024); *People v. Powell*, 2013 IL App (1st) 111654, ¶ 36. Serious provocation "is limited to the categories of substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and spousal adultery." *Powell*, 2013 IL App (1st) 111654, ¶ 36. Defendant does not argue that any of these categories apply to the facts of this case and we find that the only category even potentially relevant is "mutual quarrel or combat." Additionally, for the strong

provocation sentencing factor to apply, any threat to the defendant must be "direct and immediate." *Id.* The facts of this case, where defendant ran into the street and began shooting at a group of people about half a block away based on seeing an unknown man reach into a backpack, do not suggest that defendant was in a "mutual quarrel or combat" or that he faced a "direct and immediate threat." See *People v. Haynes*, 2024 IL 129795, ¶¶ 8, 48 (no serious provocation when the defendant shot the victim after the victim punched the defendant six or seven times); *Powell*, 2013 IL App (1st) 111654, ¶ 38 (no direct and immediate threat to support application of strong provocation sentencing factor when the defendant "could have avoided the incident entirely."). Even acknowledging that the strong provocation sentencing factor is more expansive than serious provocation, we find that this factor was not present in this case, and therefore, the circuit court did not abuse its discretion by failing to mention it.

¶ 43    Defendant next argues that the circuit court failed to consider mitigating evidence included in his PSI, including his youth, tumultuous upbringing, and potential for rehabilitation. The record contradicts his claim. The record reflects that the circuit court reviewed and considered the PSI when imposing defendant's sentence, and it found that defendant's background was "not earth-shatteringly aggravating, but it's hardly mitigating either." The court ultimately found the nature of the offense to be the most significant factor, given that it found the shooting was "senseless" and repeatedly noted that Brown was shot in the back while she fled defendant. We cannot find that the circuit court abused its discretion by finding the facts of the offense offset any mitigating qualities of defendant. See *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002) ("The seriousness of the crime is the most important factor in determining an appropriate sentence[.]"). Additionally, a "sentencing court is not required to give greater weight to defendant's rehabilitative potential

than to the seriousness of the offense." *Jackson*, 2014 IL App (1st) 123258, ¶ 53. While defendant points to multiple aspects of his background which were not explicitly mentioned by the circuit court when it announced defendant's sentence, the failure to mention each possible mitigating factor does not mean the circuit court refused to consider those factors or abused its discretion. See *Meeks*, 81 Ill. 2d at 534 ("The requirement that the trial judge set forth his reasons in the record for the particular sentence imposed does not obligate the judge to recite, and assign a value to, each fact presented in evidence at the sentencing hearing."); *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 44.

¶ 44    Defendant argues that the circuit court was required to "actually act" on mitigating evidence by reducing his sentence below the maximum. See *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48. However, "[t]he existence of mitigating factors does not mandate imposition of the minimum sentence or preclude imposition of the maximum sentence." *People v. Flores*, 404 Ill. App. 3d 155, 158 (2010). Defendant argues that this language in *Flores* was "created out of thin air" by this court in *People v. Powell*, 159 Ill. App. 3d 1005, 1011 (1987), and has no basis in precedent. However, defendant does not cite any contrary authority holding that a court is *required* to impose a sentence below the maximum if *any* mitigating factors are present, and his argument is undercut by the fact that this court has repeatedly upheld sentences at the maximum of the permissible range despite the presence of mitigating evidence. See, e.g., *Jackson*, 2014 IL App (1st) 123258, ¶ 47-56 (upholding maximum natural life sentence for first degree murder despite mitigating circumstances and rehabilitative potential); *People v. Pitts*, 2021 IL App (1st) 192478-U, ¶¶ 25-30 (maximum 30-year extended term sentence for second degree murder was not an abuse of discretion despite evidence of defendant's troubled upbringing, rehabilitative potential,

supportive family, and remorse for his actions). Defendant's 20-year sentence was not an abuse of discretion.

¶ 45    For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 46    Affirmed.